In re Robert Burns JENSEN and Rosemary Tooker Jensen.

Robert Burns JENSEN and Rosemary Tooker Jensen, Plaintiffs,

v.

BANK OF AMERICA N.T. & S.A., California Department of Health Services, et al., Defendants.

Bankruptcy No. 284–00512–A–7. Adv. No. 289–0147.

United States Bankruptcy Court, E.D. California.

May 18, 1990.

Terrance Stinnett, San Francisco, Cal., for plaintiffs.

Timothy R. Patterson, Deputy Atty. Gen., San Diego, Cal., for defendants.

## MEMORANDUM OPINION AND DECISION

LOREN S. DAHL, Chief Judge.

### FACTS

During 1983, Robert Burns Jensen and Rosemary Tooker Jensen were president and vice-president, respectively, of Jensen Lumber Company (hereinafter "JLC"). The Jensens also served as directors of this

closely-held corporation with each spouse owning fifty (50) percent of the shares of the corporate stock. JLC occupied, as lessee, real property located in Trinity County, California (hereinafter the "Site"). Prior to JLC's lease of the Site, it had been used for lumber mill operations for over thirty years.

In May of 1983, JLC obtained operating loans from Bank of America. The loans were secured by the inventory, accounts receivable, logs, and mill equipment of JLC. Bank of America also took an unrecorded assignment of the real property lease of the Site as additional security. After obtaining the operating loans from Bank of America, JLC commenced its actual business in May of 1983. Part of JLC's operations involved the dipping of lumber in a fungicide solution containing pentachlorophenol ("PCP" or "Penta"). The fungicide solution was held in an above-ground six foot by six foot by twenty foot cinder block tank.

By November of 1983, JLC was in violation of its loan covenants to Bank of America and it demanded payment of all sums due and owing. JLC ceased operations and filed a voluntary petition under chapter 11 of the Code on December 2, 1983. When JLC closed, it left the above-ground dip tank still filled with the PCP solution. Pursuant to its loan agreement, Bank of America took control of and liquidated the assets of JLC. On February 13, 1984, the Jensens filed a petition under chapter 7 of the Code. Soon after the filing, it was determined that the Jensens personal bankruptcy was a no asset case. On July 16, 1984, the Jensens obtained a discharge and their case subsequently was closed on February 20, 1985. The JLC case, which had been converted to a chapter 7 on March 20, 1984, was closed on March 18, 1987.

On February 2, 1984, the California Regional Water Quality Control Board discovered a potential hazardous waste problem involving the fungicide solution which still remained in the cinder block dip tank on the Site. The California Department of Health Services (hereinafter "DHS") was subsequently notified of the problem in March of 1984, and on May 18, 1984 removed approximately 5,000 gallons of the liquid fungicide which had been abandoned at the Site.[1] At the time, soil samples taken at the Site revealed that PCP and other toxic chemicals had contaminated the soil adjacent to the kiln building where the Jensens formerly conducted their business and would have to be cleaned up as well.

In March of 1987, the DHS informed the Jensens that they were considered potentially responsible parties pursuant to California Health and Safety Code section 25347.7 and might, as a result, be held personally liable for the costs related to the cleanup of the hazardous waste at the Site.[2]

In June of 1988, the DHS issued its Draft Remedial Action Plan, the purpose of which is to summarize site data gathered during the remedial investigation and design, plan, and implement a final remedial action for the Site. Under California law, the Draft Remedial Action Plan is circulated for public and responsible party input, whereupon a final Remedial Action Plan is adopted, prior to the DHS undertaking final remedial action at the Site. In this case, the final Remedial Action Plan was issued in October of 1988 and allocated ten (10) percent of financial responsibility for cleanup of the Site to the Jensens. The remaining ninety (90) percent of financial

---

**1.** DHS is the state agency charged with regulating the handling, treatment, storage and disposal of toxic and hazardous waste materials. Of particular relevance to this case, the DHS is also charged with overseeing and, where necessary, performing the cleanup of sites where hazardous substances have been released into the environment. This is effected pursuant to the Hazardous Substance Account Act, also known as "HSA" or the "State Superfund". Cal.Health & Safety Code secs. 25300 et seq.

**2.** California Health and Safety Code sec. 25347.-7(a) states in part, "A potentially responsible party is liable for reimbursing the state account or the Hazardous Substance Cleanup Fund for all expenditures associated with the identification, characterization, and remediation of hazardous substance release sites, including interest and administrative costs, pursuant to Section 25360, for any of these activities which occur before July 1, 1989".

responsibility was apportioned as follows: neighboring lessee Jack E. Beebe dba Hyampom Lumber Company (75%), owner-lessor Van Patten Garrett (5%), owner-lessor Robert M. Garrett (5%), and Bank of America (5%).

The debtors subsequently moved to re-open their personal bankruptcy case which this court granted. The debtors then filed this adversary proceeding seeking judgment that the claims of the defendants for reimbursement for the cleanup costs of the site arose out of the prepetition conduct of the debtors and hence were discharged. The debtors then filed the present motion for summary judgment against the DHS.[3] The DHS, in opposition to the debtors' motion, filed a cross-motion for summary judgment on the grounds that its claim for a portion of the cleanup costs did not arise until the costs were incurred postpetition and, therefore, its claim was not discharged.

The key issue this court must confront is when does a claim arise under the state Hazardous Substance Account Act (hereinafter HSA) for purposes of discharge in bankruptcy? Based on the discussion below, this court finds that for purposes of determining discharge in bankruptcy, such a claim arises when costs are incurred by the state, and accordingly grants the DHS's cross-motion for summary judgment.

## DISCUSSION

### Summary Judgment is Appropriate

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 7056, provides that summary judgment is proper, "if the pleadings, ... together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law". Recently, the Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) stated,

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Citing* 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure sec. 2725 pp. 93–95 (1983).

In this case, the debtors argue that all of the conduct which gives rise to their liability to the DHS occurred prepetition. As such, the debtors contend that the claim of DHS was in existence on the date of the bankruptcy filing and was discharged in their chapter 7 case.

The DHS vehemently argues that the issue of the timing of the conduct of the debtors is irrelevant and that the case turns on the premise that toxic cleanup cost recovery claims arise when costs are incurred by the government. The DHS argues that even if the court should consider the timing of the debtors' conduct, whether pre- or postpetition, then summary judgment is inappropriate because the record is unclear as to when the contamination occurred. DHS posits that the contamination could have occurred: when the debtors treated the wood while operating their business; after the debtors ceased operations and abandoned the dip tank full of the fungicide; or both before and after the filing date of their chapter 7 petition.

The court agrees with DHS and finds that the only material fact that will affect the outcome of this case under the governing law is the date on which the DHS expended funds to clean up the Site. In all of the pleadings, as well as debtors' declarations, it is undisputed that the DHS first incurred costs on May 18, 1984, more than three months after the Jensens filed their

---

**3.** According to the debtors, at the time this motion was filed defendant Bank of America had stipulated to the entry of a judgment determining that the debt owed to it has been discharged and a judgment pursuant to that stipulation was entered on September 7, 1989. Similar stipulations and/or requests for entry of default judgment were being prepared as to the other defendants.

personal Chapter 7 petition. Therefore, because there is no genuine issue as to when the DHS used the HSA superfund to clean up the Site, the DHS is entitled to summary judgment as a matter of law.

*The DHS's Claim Under the HSA Arose Postpetition*

■ As with any case involving bankruptcy and environmental cleanup laws, the proper starting point is a discussion of the Supreme Court's decision in *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). In *Kovacs*, the state of Ohio filed a complaint in the bankruptcy court seeking a determination that Kovacs' obligation under a prepetition stipulation to clean up a waste disposal site was not dischargeable in bankruptcy. The state argued that Kovacs' breach of his obligation did not give rise to the right to payment within the meaning of section 101(4)(B) of the Code. Agreeing with the bankruptcy court, the Supreme Court held that the cleanup order had been converted into an obligation to pay money, an obligation that was dischargeable in bankruptcy.

Although *Kovacs* applies to this case insofar as it labels what the DHS is seeking as a "claim", it nonetheless provides little guidance in resolving the issue with which this court is faced. *Kovacs* is useful only in determining whether or not a claim exists.

Cal.Health and Safety Code sec. 25360(a)[4] states, "[a]ny costs *incurred* and payable from the state account or the Hazardous Substance Cleanup Fund shall be recovered ... from the liable person or persons". (emphasis added). This language indicates that the DHS cannot assert that it has a claim under sec. 25360(a) until it has fulfilled one critical element of HSA liability: the expenditure of state funds at the Site. Unless the DHS incurs recovera-

ble cleanup costs, it has no claim under sec. 25360(a). *Bulk Distribution Centers v. Monsato Co.*, 589 F.Supp. 1437, 1450–1454 (S.D.Fla.1984) (a private claimant must first incur response costs under CERCLA before seeking contribution or indemnity from three corporate defendants). *Cf. Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 799 F.2d 1312, 1316 (9th Cir.1986) (the incurring of response costs is a requirement of a plaintiff's private CERCLA action).

In the instant case the DHS did not even know of the debtors let alone incur any costs in cleaning up the toxic waste at the Site until after the debtors filed their personal bankruptcy. It is undisputed that the debtors filed their petition on February 13, 1984 and that the DHS did not learn of the problem until one month later. Moreover, the DHS did not expend any of the state funds until it began cleaning up the Site on May 18, 1984.

Theoretically, what if the toxic waste at this site was never discovered? Or, upon discovery, what if the DHS had decided for whatever reasons not to pursue any remedial actions? Under either scenario, no claim would have arisen because the DHS did not spend any of the state superfund to clean up the Site. Thus, the DHS's claim, pursuant to sec. 25360(a), arose only after it incurred recoverable cleanup costs.

*Claims Based Upon Conduct of the Debtor*

■ In reaching this conclusion the court is mindful of cases which have held that a claim can arise with the prepetition conduct of the debtor. Most common are the mass tort situations in which negligent conduct by the debtor results in injury to the victim-claimant. In such cases the victim's cause of action under state law arises upon

---

4. In this case the DHS bases its claim under the state HSA, discussed *supra*. It is important to explain, however, the other legal authority upon which the DHS acts. The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. secs. 9601–9657 (hereinafter "CERCLA"), is the federal equivalent of the HSA. In addition, the Environmental Protection Agency (hereinafter "EPA") is the federal equivalent of the DHS. As a general method of practice with respect to toxic sites where DHS has expended funds for remedial action, DHS seeks to recover its response costs under both CERCLA and HSA, in lawsuits filed in federal court alleging a CERCLA cause of action and a pendent state law claim under the HSA. It appears to the court that general references to CERCLA cases as authority is permissible in light of the strong similarity and interdependence between the two.

discovery of the injury, while for purposes of bankruptcy law the claim arises with the negligent conduct of the debtor and, therefore, such claim can be discharged in the event the debtor subsequently files for bankruptcy before the victim-claimant is able to recover. *In re A.H. Robins Company, Inc.*, 63 B.R. 986 (Bankr.E.D.Va. 1986), *aff'd, Grady v. A.H. Robins Company, Inc.*, 839 F.2d 198 (4th Cir), *cert. dismissed*, 487 U.S. 1260, 109 S.Ct. 201, 101 L.Ed.2d 972 (1988); *In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986); *In re Johns-Manville Corp.*, 57 B.R. 680. (Bankr.S.D.N.Y. 1986).

In *Edge*, a plaintiff wanted to sue two Chapter 7 debtors for negligent dental treatment which had occurred as a result of the debtors' prepetition conduct. The plaintiff's injuries did not arise until postpetition. The court held that the claim arose, for bankruptcy purposes, at the earliest point in the relationship between the victim and the debtor-wrongdoer. Thus, the claim arose the instant the debtors performed the negligent treatment.

In *Johns-Manville*, parties with third-party claims against the debtor relating to prepetition activity sought relief from or modification of the automatic stay. In denying the claimants' motion, the court held that a claim arises at the time when the acts giving rise to the alleged liability were performed, which occurred prepetition when the debtor provided the allegedly defective product.

Similarly, in *Robins*, a Dalkon Shield claimant sought a declaration that her tort claim against the debtor-manufacturer was postpetition and not subject to the automatic stay. The claimant was a victim of the debtor's prepetition misconduct. Following *Johns-Manville*, the bankruptcy court held that women who were allegedly injured by the Dalkon Shield have a right to payment (i.e. a claim) which arises when the acts giving rise to the alleged liability were performed. Thus, the claim arose prepetition when the claimant was inserted with the defective product and was subject to the automatic stay. The court in *Robins* rejected claimant's argument that her claim, for federal bankruptcy purposes, arose postpetition, the same time her cause of action arose under state law.

The tort situations referred to in *Edge, Johns-Manville*, and *Robins* are distinguishable from a claim based upon CERCLA or HSA. In a tort case the creditor plaintiff has done everything necessary to give rise to some obligation by the debtor. Drabkin, Moorman, and Kirsch, *Bankruptcy and the Cleanup of Hazardous Waste: Caveat Creditor*, 15 Envtl.L.Rep. 10168, 10176 (June 1985). Whether the tort consisted of providing a toxic product or inserting a Dalkon Shield, all of the crucial elements of liability occurred and the claim consequently arose the moment the debtor's negligent conduct occurred. The only question remaining was when the victim-claimant would discover or should have discovered the injury in order to file a timely lawsuit. Regardless of when the victim-claimant discovered his injury, under *Edge, Johns-Manville*, and *Robins* the claim in bankruptcy is deemed to have arisen when the debtor's tortious conduct took place and is therefore a prepetition claim subject to discharge.

A premature CERCLA or HSA claim, however, is unlike a tort that has been committed prepetition but not yet sued upon, because crucial elements of the liability have yet to take place. Drabkin at 10176. The fact that toxic waste leaked on the Jensen's property does not mean that CERCLA or HSA liability automatically arose. It was only upon the expenditure of recoverable funds that a CERCLA/HSA claim arose. *Id.* Quite simply, there was no prepetition "rooting" of the DHS's right to payment. *Johns-Manville*, 57 B.R. at 690.

Because the facts reveal that the DHS did not expend any state funds until after the Jensens had filed their personal petition in bankruptcy, the resulting HSA claim did not arise until postpetition and is, therefore, not subject to discharge.[5]

---

5. Debtors also cite *In re Dant & Russell, Inc.* 853 F.2d 700 (9th Cir.1988) for the proposition that

"damages caused during the prepetition period are not entitled to administrative expense priori-

*The LTV Case*

Recently, the District Court for the Southern District of New York addressed an issue quite similar to the one in this case in *In re Chateaugay Corporation,* (The LTV Corp.), 112 B.R. 513, 278 Bankr.L.Rep. (CCH) para. 73,295 (S.D.N.Y.1990). In *LTV,* the federal government and the state of New York sought declaratory judgments as to the dischargeability of CERCLA and related state law claims upon the confirmation of LTV's Chapter 11 reorganization plan. After a thorough discussion of CERCLA, the court addressed the issue of defining a claim and determining when a claim arose. The court noted that a contingent claim has been defined as one in which "the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties *at the time the original relationship of the parties was created"*. 112 B.R. 513, 278 Bankr.L.Rep. para. 73,295 at 96,691 *citing In re All Media Properties, Inc.,* 5 B.R. 126 at 133 (Bankr.S.D.Tex.1980). (emphasis added). As for ascertaining when a claim arises, the court followed the rule articulated in *Johns–Manville* that a claim, even a contingent claim, arises when the acts giving rise to the alleged liability were performed. *Id.*

This much established, the court then turned to the inherent conflict between CERCLA and the Bankruptcy Code. The court confronted the dilemma (one so familiar to this court. *supra* ) that for purposes of defining a claim in bankruptcy, the liabilities imposed by CERCLA and other similar state and federal environmental statutes do not fit neatly within the parameters of the tort and contractual situations. Surprisingly, though, the court then proceeds to force environmental claims into these same parameters by basing the determination of discharge on whether there has been a prepetition release or threatened release of hazardous waste. *Id.* The court rejects the government's argument that CERCLA liability had not yet arisen because costs had not yet been incurred. *Id.* 112 B.R. 513, 278 Bankr.L.Rep. para. at 96,692.[6]

■ Although this court disagrees with the reasoning in *LTV,* it finds that even if it is applied to the facts here, the DHS does not have a prepetition claim subject to discharge. For example, assume for the sake of argument that prepetition conduct of the Jensens was the event triggering liability. Under the *LTV* court's definition, to be a contingent claim the occurrence of some future event (in this case, presumably the incurring of cleanup costs by the state) must have been within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created. The dilemma is that there was never any prepetition contact, let alone relationship, between the Jensens and the DHS. The DHS never communicated or even heard of the Jensens until after the

ty". In *Dant & Russell,* a lessor filed a claim asserting administrative priority for potential costs of cleanup of toxic wastes deposited by a debtor on leased property. After the debtor had filed a chapter 11 petition, it entered into new leases with the lessor. The leases obligated the debtor to comply with certain environmental standards, which were violated when toxic contamination occurred on the property.

In holding that the damages caused prepetition were not entitled to administrative expense priority, the Ninth Circuit stated that since the effect of rejection of the lease by the district court under 11 U.S.C. sec. 365(g) was to treat the breach of an unexpired lease as occurring prepetition, it followed that the consequent damages should likewise be regarded as prepetition.

It is the opinion of this court that the circumstances involved in *Dant & Russell* are too far removed from this case for it to serve as any source of authority. The facts of this case require a determination of when a CERCLA/HSA claim arises for purposes of discharge in bankruptcy, and do not lend themselves to be decided on section 365 grounds.

6. "So long as there is a prepetition triggering event, i.e., the release or threatened release of hazardous waste, the claim is dischargeable, regardless of when the claim for relief may be in all respects ripe for adjudication. Very frequently, only one part of a tort occurs prepetition, with the injury occurring postpetition. Such claims are nonetheless dischargeable." *LTV,* 112 B.R. 513, 278 Bankr.L.Rep. para. at 96,692. The court then goes on to cite *Robins* and *Johns–Manville,* standard tort cases.

filing of their petition. Thus, how could the parties have actually or presumably contemplated prepetition, that at some future time postpetition the DHS would have a claim for costs incurred in cleaning up and removing toxic waste at the Site? Hence, under the reasoning in *LTV* the DHS did not have a contingent claim.

This court finds it hard to accept the conclusion that a CERCLA claim arises, for purposes of discharge in bankruptcy, upon the release or threatened release of hazardous waste. Section 101(4) of the Code defines "claim" as a "right to payment". This court does not understand how a CERCLA claim arises when the EPA has not yet earned the right to payment by incurring costs in cleaning up the toxic waste. The mere act of spilling toxic waste may give rise to other types of damage claims, i.e. personal injury or property damage, not to mention possible criminal penalties, but it does not cause a CERCLA claim to arise. Only when the DHS uses the state superfund to remedy the contamination does it receive a right to payment under the HSA.

*Public Policy Favors Placing Responsibility on the Jensens*

In support of the findings enunciated above, the court also believes that the DHS's motion for summary judgment should prevail based on strong public policy considerations. All parties involved have recognized the valuable public policy favoring protection of the environment and the accompanying importance of removing hazardous waste from the environment. It is no secret that protection and preservation of the environment are at the forefront of our national agenda. A fine illustration of this is Congress' enactment of CERCLA and the companion HSA legislation in California. The cost recovery policies of both CERCLA and HSA are designed to impose the cost of cleaning up hazardous waste sites squarely on those who were responsible for and profited from the presence of such substances in the first place. *See* 42 U.S.C. sec. 9607 and Cal.Health & Safety Code sec. 25360. Not surprisingly, this policy could not be carried out for very

long if the responsible parties were permitted to evade their obligation to reimburse the state superfund. It would only take a few cases before the various funds would be exhausted and future contaminated sites would go uncleaned. Such an outcome not only contravenes legislative intent, but is an extremely frightening proposition in light of the growing number of toxic waste sites in this state and the country.

Weighing and competing heavily against the objectives of the environmental legislation are those of the Code. In particular is the profound policy of offering debtors a "fresh start." Certainly, one of the fundamental attractions of bankruptcy is discharge of prepetition debts. The Code, however, does not provide for a discharge of debts arising postpetition; only the claims of creditors that arose prepetition can be discharged in bankruptcy.

In *Midlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), the Supreme Court addressed the conflicting policies of the Bankruptcy Code and state environmental protection laws. In *Midlantic*, Quanta Resources Corp. filed for bankruptcy after it was discovered that it had illegally stored oil contaminated with a carcinogen at sites in New Jersey and New York and state environmental protection officials had ordered the sites cleaned up. The trustee in bankruptcy proposed to abandon both sites under 11 U.S.C. sec. 554(a) on the grounds that they were burdensome and of inconsequential value to the estate. The Third Circuit reversed the bankruptcy court and district court and held that Congress in enacting sec. 554 did not intend to permit the abandonment of property of a bankrupt estate in contravention of state environmental protection laws. The Supreme Court affirmed and held that a bankruptcy trustee may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards.

Although *Midlantic* was decided in the context of the trustee's abandonment power, of particular relevance to this case was

the Court's recognition of, "Congress' undisputed concern over the risks of the improper storage and disposal of hazardous and toxic substances" in enacting CERCLA. 474 U.S. at 506, 106 S.Ct. at 762. Furthermore, the Court was not hesitant to support its case by acknowledging the "repeated congressional ... 'goal of protecting the environment against toxic pollution' ". 474 U.S. at 505, 106 S.Ct. at 761, *citing Chemical Manufacturers Ass'n., Inc. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 143, 105 S.Ct. 1102, 1116, 84 L.Ed.2d 90 (1985).

Debtors argue that to uphold the position asserted by the DHS would fly in the face of the debtors' right to a "fresh start" and would be contrary to the holding in *Kovacs* and *United States v. Whizco* 841 F.2d 147 (6th Cir.1988).[7] Debtors fail to see, though, that in both *Kovacs* and *Whizco* the government agency had prepetition involvement with the debtor. In *Kovacs* the state of Ohio had already brought suit, obtained a stipulated judgment and injunction, and consequently appointed a receiver before the petition had even been filed. Likewise, in *Whizco,* the United States had issued three administrative orders and eventually brought suit prior to the filing of the bankruptcy petition.

An additional concern of the court is that if the debtors' motion were granted, the pragmatic effect would be to require all federal and state agencies involved in CERCLA and related actions to file proofs of claim in every bankruptcy case filed where the debtor owns property within a given agency's jurisdiction, regardless of whether the particular agency is aware of any toxic contamination. This very hardship was recognized by the Second Circuit in *In re Combustion Equipment Associ-*

*ates, Inc.,* 838 F.2d 35, 40 (2d Cir.1988) when the court stated,

[i]f the EPA is forced to expend its resources on preserving its rights to eventual recovery against any PRP ... the EPA will have less ability to pursue its primary mission of cleaning the sites.... Congress has directed the courts to be especially wary of interfering with CERCLA work ... in part because toxic waste sites threaten the public health and must be eradicated quickly.

CERCLA and HSA were designed to further the strong public policy endorsing protection of the environment and eradication of hazardous waste. Where the agencies charged with enforcing these statutes have had no prepetition involvement with a debtor who turns out to be a responsible party, and do not incur the costs of cleanup until postpetition, the court finds that the goals of environmental legislation can be realized without offending the bankruptcy policy of providing debtors a fresh start.

### CONCLUSION

In sum, the court finds the only material fact in this case to be the date on which the DHS expended funds to clean up the Site, and it is undisputed that such funds were not expended until after the debtors filed their petition. Consequently, the claim of the DHS for recovery of costs incurred under HSA arose postpetition and is not subject to discharge in bankruptcy. The court further adjudges that this holding effectuates the legislative intent behind HSA and CERCLA of removing hazardous waste from the environment and allocating the expense of removal on the responsible parties. The countermotion of the DHS for summary judgment is granted and the debtors' motion is denied.

---

7. In *Whizco,* the United States Department of the Interior issued three cessation orders against Whizco for its failure to satisfy a statutory obligation to reclaim land mined for coal. When Whizco failed to comply, the United States brought suit against Whizco and its sole shareholder, Lueking. The District Court found that Lueking's debts had been discharged in his subsequent Chapter 7 proceeding. The United States appealed.

The Court of Appeals held that a Chapter 7 bankruptcy discharge of the operator discharged the operator's obligation to reclaim the mine site to the extent that fulfilling such obligation would force the operator to spend money. But to the extent that the operator could comply with the order without spending money, then the obligation to do so was not discharged.

This memorandum opinion and decision shall constitute findings of fact and conclusions of law. The DHS shall prepare and submit an order consistent with this opinion.