**UNITED STATES of America, Plaintiff,**

v.

**UNION SCRAP IRON & METAL, et al., Defendants, Third–Party Plaintiffs,**

v.

**SOO LINE RAILROAD COMPANY, et al., Third–Party Defendants.**

Civ. No. 4–89–40.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 26, 1990.

Alan Held, U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Nannette Everson, McBride Baker & Coler, Chicago, Ill., for defendant Taracorp Industries, Inc.

Paul Vaaler, Faegre & Benson, Minneapolis, Minn., for defendant N.L. Industries, Inc.

Charles B. Rogers, Briggs & Morgan, Minneapolis, Minn., for defendant Johnson Controls, Inc.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Defendant Taracorp Industries, Inc. (Taracorp) seeks dismissal from this suit by the United States for recovery of response costs incurred by the government pursuant to the *Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9607.* Taracorp brought this motion under Fed.R.Civ.P. 12(b)(6); but, having introduced matters outside the pleadings in its opening brief, it asks that the court convert its motion into one for summary judgment under Fed.R. Civ.P. 56. Briefs in opposition have been filed by the United States, NL Industries, Inc. (NL), and Johnson Controls, Inc. (Johnson Controls).

### I.

In this CERCLA action, the government seeks recovery of approximately $1,200,000 for response costs incurred at 1608 Washington Avenue North, Minneapolis, Minnesota (the Washington Avenue site). The complaint names twenty defendants in addition to Taracorp, and forty-seven third-party defendants have been joined.[1]

Union Scrap Iron & Metal (Union Scrap) operated a scrap metal recovery business.

---

1. United States Magistrate Judge Bernard P. Becker issued a case management order, dated February 1, 1990, related to additional claims. It provided that each defendant and third-party defendant shall be deemed to have served available claims for contribution or indemnity against each other defendant and third-party defendant properly added as a party, and that each defendant and third-party defendant shall

As part of its operations, Union Scrap processed spent automobile batteries. The process involved removing the battery case to extract the lead battery plates inside. The plates were smelted to recover the lead; the casings were crushed and rinsed. From 1979 until 1982, Union Scrap processed used batteries for Taracorp. The battery casings were broken at one site in Minneapolis (not at issue in this case), the lead plates extracted, and the plates taken for storage to the Washington Avenue site. The plates would then be taken to Taracorp smelters in St. Louis Park, Minnesota, or Granite City, Illinois. The partially broken battery casings were also taken to the Washington Avenue site, where they were crushed further and stored.

The original processing agreement was between Union Scrap and NL (formerly National Lead), entered in 1978. In 1979, Taracorp purchased NL's smelting facilities in St. Louis Park and Granite City, and Taracorp continued the processing arrangement. Three battery manufacturers did business with Union Scrap under the agreement between Union Scrap and NL/Taracorp: Globe Union, Gould, Inc., and GM–Delco.[2] On October 1, 1982, Taracorp filed a Chapter 11 petition for protection under the bankruptcy code. In January 1985, Union Scrap petitioned for bankruptcy. As of January 1983, Taracorp's records showed that it still had 7,040 pounds of whole batteries remaining with Union Scrap.

The bankruptcy court set the deadline for the filing of claims against Taracorp as July 5, 1983; it confirmed Taracorp's plan of reorganization on July 1, 1985.

The investigation of possible hazardous materials at the Washington Avenue site was begun by the Minnesota Pollution Control Agency (MPCA) in 1983. On September 8, 1983, the MPCA recommended that the site be placed on the National Priorities List of the United States Environmental Protection Agency (EPA), which it was on September 21, 1984. In March 1985, the EPA conducted a site assessment which led to stabilization work from November 1985 to January 1986 to minimize the imminent public health risks. The lead plates and crushed battery plates stored at the site were leaching lead and other hazardous materials into the soil and water. In October 1987, the State of Minnesota, using EPA Superfund monies, performed a Remedial Investigation and Feasibility Study (RI/FS) at the site. In April 1988, the EPA conducted an emergency removal action, removing contaminated battery pieces and the upper one to three feet of contaminated soil from the site. On March 30, 1990, the EPA issued its Record of Decision, concluding that no further action was required to clean up the site.

A fact of central importance, in Taracorp's view, is the participation of the EPA in negotiations regarding Taracorp's two lead smelting facilities during the bankruptcy proceedings. The State of Minnesota filed a claim regarding environmental liabilities at the Taracorp St. Louis Park facility; the State of Illinois filed a similar claim regarding the Taracorp Granite City facility. The EPA did not file a claim. The Taracorp plan of reorganization stated that it preserved from discharge "allowed claims of all governmental units ... arising out of alleged violations by the Debtor of federal or state environmental statutes and regulations in connection with the Debtor's operations at any of its facilities." (Taracorp reply br. at 4). Taracorp negotiated with the EPA, Minnesota and Illinois regarding its environmental liabilities at its two lead smelting facilities; it shows (and the EPA does not dispute) that the EPA purposefully chose not to bring any claims in bankruptcy regarding these sites. The order confirming the plan stated that "the claim of any ... governmental unit, or other entity, that (i) was not filed with the Court on or before July 5, 1983, and (ii)

be deemed to have served the same defenses against any such claim asserted in its answer to the complaint or third-party complaint.

**2.** The briefs of the government and Taracorp identify Gould, Inc., as a division of Johnson Controls, but the case caption identifies Globe Union as a division of Johnson Controls. Exhibit A to the brief of Johnson Controls shows that the case caption is correct.

that is not scheduled, or is scheduled as contingent ... shall be, and hereby is, disallowed, discharged and forever barred." (Taracorp main br. at 10).

While the EPA does not dispute these facts, it points to the fact (which Taracorp does not dispute) that the bankruptcy proceedings involved only Taracorp's own two facilities, *not* the Union Scrap Washington Avenue site where Taracorp contracted with Union Scrap for battery processing. Nowhere in its bankruptcy disclosure statement or plan of reorganization did Taracorp acknowledge its potential liabilities at the Washington Avenue site.[3] The EPA points out that it did not know until August of 1989 that Taracorp had any relation to the Washington Avenue site, and thus could not know of its potential CERCLA claim against Taracorp until some years after Taracorp filed for bankruptcy.

## II.

Taracorp argues that its CERCLA liabilities to the United States have been discharged in bankruptcy. It contends that the EPA's suit is a "claim" within the meaning of the bankruptcy code. Because the release or threatened release of a hazardous substance at the Washington Avenue site occurred before it petitioned for bankruptcy and the court confirmed its reorganization plan, Taracorp argues, the EPA should have brought its CERCLA claim to those proceedings, but did not. The power of the bankruptcy court to estimate "contingent claims" is sufficient, Taracorp contends, to include potential CERCLA liabilities along with the tort liabilities it already estimates. Taracorp finds confirmation for this view in the approach courts have taken to insurance coverage for environmental liabilities—that claims must be honored for damage that occurs during the policy period even if the harms go undiscovered for some time afterward. The EPA should have filed prospective

claims against Taracorp, it contends, especially since the EPA already knew about Taracorp's own lead processing facilities.

The government argues that Taracorp's CERCLA liabilities arose only after its reorganization plan had been confirmed by the bankruptcy court. Under the substantive law of CERCLA, according to the government, liability for clean-up response costs cannot exist until the EPA has first actually incurred those costs. The government argues that this fits the purpose of CERCLA to protect public health by providing for immediate remedial action by the EPA and later identification and bringing of claims against potentially responsible parties (PRP's). If the EPA had to litigate every possible CERCLA claim each time a conceivable PRP entered bankruptcy, the government contends, then the statutory goals of CERCLA—immediate response, later payment—would be undermined. The EPA would be forced to respond to countless bankruptcy proceedings involving as yet unknown environmental dangers and liabilities.

In addition to concurring in the government's arguments, NL argues that Taracorp is not entitled to judgment even on its own set of facts and statement of the law. It points out that Taracorp acknowledges that the pile of hazardous material was still sitting at the Washington Avenue site, still causing environmental damage, even after July 1985 when the bankruptcy plan was confirmed. NL also argues that its crossclaim and third-party claim for contribution or indemnity against Taracorp should survive any action on Taracorp's motion as to the government. According to NL, this is because the CERCLA liabilities arose only after Taracorp's petition and confirmation. NL had no notice of its need to protect its claims against Taracorp in the bankruptcy proceedings. To hold those claims discharged now, NL argues, would deprive it of due process and a fair opportunity to

---

**3.** In its amendments to its schedule of contingent liabilities, filed in the bankruptcy court on May 2, 1983, Taracorp added the EPA as holding a contingent liability in an "Amount Unknown." No further information was provided to the EPA or the bankruptcy court.

In the confirmed reorganization plan, all filed environmental claims were preserved from discharge, except for claims relating to Taracorp's Granite City facility which were subject to separate and detailed treatment.

protect claims of which it had no knowledge.

Johnson Controls argues, as does the government and NL, that Taracorp's motion should be denied because the CERCLA liabilities arose after its discharge from bankruptcy. Johnson Controls also argues that Taracorp's Rule 12(b)(6) motion should be denied as such because it includes evidence outside the pleadings. Johnson Controls further contends that as a motion for summary judgment, it should be denied because there has been inadequate time for discovery and Taracorp has failed to meet its burden of proof[4] that claims for clean-up costs were discharged in bankruptcy.

### III.

This motion presents a question not yet addressed by any court of appeals. The parties see a fundamental conflict between the goals of the Bankruptcy Act and the CERCLA/Superfund legislation. Should a party's liabilities for environmental damage be discharged in bankruptcy when the harm was done pre-petition, but it was not known at the time to the EPA that the party was potentially responsible, and when CERCLA liability could not be incurred until after bankruptcy reorganization was complete?

Although presented as a motion to dismiss pursuant to Fed.R.Civ.P. 12, Taracorp and the other parties have presented material outside the pleadings. At oral argument, the parties did not dispute that the motion should be treated as provided in Rule 56, as one for summary judgment.

On a motion for summary judgment, all material facts and inferences are construed in favor of the non-moving party. *Agri-Stor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). To defeat a motion for summary judgment, however, the non-moving party must show through specific evidence that there are material facts in dispute creating a genuine issue for trial; it may not rest only upon the allegations or denials of its pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Taracorp argues that its potential CERCLA liability is a claim or a contingent claim under the bankruptcy code which was discharged when its reorganization plan was confirmed. A claim under the bankruptcy code is defined as a "right to payment." 11 U.S.C. § 101(4)(A). Claims which arose before the date of the bankruptcy court order confirming the debtor's plan of reorganization are discharged. 11 U.S.C. § 1141(d)(1)(A). This is the "fresh start" which can be obtained through bankruptcy.

 While a bankruptcy claim comprises a "broad" category of legal obligations, *Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 707, 83 L.Ed.2d 649 (1985), nonbankruptcy substantive law defines when a particular relationship between a debtor and a third party amounts to a legal obligation reflecting a claim for bankruptcy purposes. *In re Remington Rand Corp.,* 836 F.2d 825, 830 (3d Cir.1988). A claim exists only when the pre-bankruptcy relationship between the debtor and third party contained all the elements necessary to give rise to a legal obligation under the relevant substantive non-bankruptcy law. *In re UNR Indus., Inc.,* 29 B.R. 741, 745–46 n. 4 (N.D.Ill.1983).

 The relevant substantive law in this case is CERCLA. To establish a legal obligation under CERCLA, four elements must be established: (1) there must be a facility; (2) there must be a release or threatened release of a hazardous substance at the facility; (3) there must be a responsible person (as defined by the statute); and (4) the United States must have incurred necessary costs in responding to the release at the facility. *See United States v. Aceto Agricultural Chems. Corp.,* 872 F.2d 1373, 1378–79 (8th Cir.1989).

 CERCLA provides no basis for Taracorp's position that the mere release of a hazardous substance is sufficient to create a legal obligation constituting a claim in

---

**4.** Discharge in bankruptcy is an affirmative defense for which Taracorp has the burden of proof, Fed.R.Civ.P. 8(c).

bankruptcy. Under CERCLA, a release or threatened release of a hazardous substance triggers the authority of the EPA to respond—a response which includes investigating the release, determining the extent of harm, deciding how best to remedy it, incurring response costs, and identifying potentially responsible parties. 42 U.S.C. §§ 9604, 9606. Because the EPA had incurred no response costs at the time of Taracorp's confirmation, the EPA could have no claim in the bankruptcy proceedings—there was no legal obligation under CERCLA.

Taracorp's argument that its potential CERCLA liability was, if not a full-blown claim, then a "contingent claim" in bankruptcy is also unpersuasive. A standard definition of a contingent claim dischargeable in bankruptcy is as follows:

> The debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created.

*In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.*, 646 F.2d 193 (5th Cir.1981). Taracorp argues that the EPA had "actual or presumed" knowledge of the environmental hazards at the Washington Avenue site on the basis of the EPA's participation in the negotiation of bankruptcy claims involving Taracorp's own Granite City facility in Illinois. The EPA disputes this, contending that neither it nor Taracorp itself had any knowledge that a CERCLA claim against Taracorp for treatment of hazardous substances at *Union Scrap's* Washington Avenue site would or could arise years later. Taracorp replies that its reorganization plan would have preserved any filed environmental claims from discharge, and that the EPA should have presumed knowledge of the hazards at the Washington Avenue site based on its general knowledge of Taracorp's operations and its demonstrated capacity to speculate about possible hazards at these facilities. It is important to note that Taracorp does not suggest that

the EPA had actual knowledge of its role in the Washington Avenue site.

Taracorp's allegations are not sufficient to entitle it to summary judgment. That the EPA can imagine hazards at Taracorp's many facilities does not give rise to a presumption of knowledge of the hazards at the Washington Avenue site, especially when that site was actually operated by Union Scrap, not Taracorp, and Taracorp does not contend that the EPA had any knowledge that Taracorp was in any way involved with that site. Whether Taracorp might have a stronger argument if it had made a more complete disclosure of its liabilities, including the present claim, during its bankruptcy proceedings—or if the EPA had had knowledge of its involvement in the site—need not be decided on this motion.

Taracorp relies on *In re Chateaugay Corp.*, 112 B.R. 513 (S.D.N.Y.1990), to support its position. In *Chateaugay*, LTV Corporation sought declaratory judgments in its bankruptcy proceedings to discharge CERCLA and state environmental claims upon the confirmation of its reorganization plan. The court held that LTV's liabilities were discharged to the extent the release of hazardous substances giving rise to the claims occurred before the bankruptcy petition. The posture of the present case involving Taracorp is, however, quite different. The government agencies in *Chateaugay* had the opportunity after the court's declaration to still file their environmental claims before confirmation—the context of the decision was the ongoing bankruptcy proceedings. Here Taracorp seeks to discharge claims based on bankruptcy proceedings which ended five years ago. Since Taracorp has not shown that the EPA had actual or presumed knowledge of its potential CERCLA claims during those proceedings, and therefore had the opportunity to file claims but failed to do so, *Chateaugay* should not be followed here.[5]

Taracorp asks the court to hold that the mere release or threatened release of haz-

5. The fact that the hazardous piles of lead plates and battery casings may have remained at the Washington Avenue site after the confirmation of Taracorp's reorganization plan is also relevant because of possible post-confirmation environmental harm.

ardous substances, without actual or presumed knowledge resulting in discovery, investigation, response or the incurring of costs, should be considered a contingent claim dischargeable in bankruptcy. Taracorp draws an analogy to tort and insurance cases, where claims were discharged based on the debtor's pre-petition conduct. This analogy is inapposite. In the tort examples, the debtor's pre-petition conduct had already caused the injury and created a legal right to seek recovery, even if the injury went undiscovered for some time. Under CERCLA, however, the government is precluded from seeking monetary relief from potentially responsible parties until after response funds have been expended. *See United States v. Price*, 577 F.Supp. 1103, 1110 (D.N.J.1983). The tort claimant has a legal interest to protect in the bankruptcy proceeding; the government does not under CERCLA. In Taracorp's insurance case examples, coverage is extended to include environmental harms which were caused during the policy period but went undiscovered until afterward. The insurance context is contract law, however, where parties bargain regarding future contingencies in establishing their legal relationship. Insurance is an agreement providing coverage for unknown risks which is triggered by the event itself apart from the response made by third parties. CERCLA liability, on the other hand, is only triggered by the discovery, investigation, remedial action and incurring of costs regarding certain and known harms. At no time was there any "meeting of the minds" between Taracorp and the EPA regarding potential liabilities at the Washington Avenue site; and given the EPA's lack of knowledge and Taracorp's failure of disclosure in bankruptcy, Taracorp's analogy to insurance law fails.

Taracorp's position that a release or threatened release alone constitutes a dischargeable claim would undermine the goals of CERCLA. Keeping Taracorp in this case as a potentially responsible party is supported by the policies underlying the CERCLA legislation. The essential purposes of CERCLA have been described as follows:

First, Congress intended that the federal government be immediately given the tools necessary for a prompt and effective response to the problems of national magnitude resulting from hazardous waste disposal. Second, Congress intended that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibilities for remedying the harmful conditions they created.

*United States v. Reilly Tar & Chem. Corp.*, 546 F.Supp. 1100, 1112 (D.Minn. 1982). CERCLA contemplates immediate response to hazardous waste problems. To support this goal, Congress specifically prohibited courts from hearing any challenges to removal or remedial actions taken by the EPA until after it has initiated an enforcement action or an action seeking recovery of response costs. 42 U.S.C. § 9613(h). In upholding the dismissal of complaints seeking pre-enforcement review of CERCLA matters the Second Circuit stated:

> [t]o introduce the delay of court proceedings at the outset of a cleanup would conflict with the strong congressional policy that directs cleanups to occur prior to a final determination of the party's rights and liabilities under CERCLA. These policy concerns extend across the spectrum of possible EPA responses.... Hence, we agree "unequivocally that pre-enforcement review of EPA's remedial actions ... [is] contrary to the policies underlying CERCLA." *Wheaton Indus. [v. EPA]*, 781 F.2d [354,] 365 [ (3d Cir. 1986) ].

*Wagner Seed Co. v. Daggett*, 800 F.2d 310, 315 (2d Cir.1986); *accord Solid State Circuits, Inc. v. United States Envtl. Protection Agency*, 812 F.2d 383, 388 (8th Cir. 1987).

Adopting Taracorp's position would effectively require pre-enforcement CERCLA litigation by forcing the EPA to investigate and assess its potential CERCLA claims every time a conceivable potentially responsible party filed for bankruptcy. This would reverse the CERCLA scheme and threaten the effectiveness of EPA action.

If the EPA is forced to expend its resources on preserving its rights to eventual recovery against any [potentially responsible party] ... the EPA will have less ability to pursue its primary mission of cleaning the sites.... Congress has directed the courts to be especially wary of interfering with CERCLA work ... in part because toxic waste sites threaten the public health and must be eradicated quickly.

*In re Combustion Equip. Associates, Inc.,* 838 F.2d 35, 40 (2d Cir.1988). Congress did not intend the EPA to be embroiled in litigation over the wisdom, scope, and costs of various possible remedies to clean up dangerous sites before the EPA had spent any resources investigating, evaluating, and implementing a remedy for these sites. Taracorp's position cannot be squared with the CERCLA legislative scheme.

A sensible approach to balancing environmental and bankruptcy policy goals is outlined in *In re Jensen,* 114 B.R. 700 (Bkrtcy.E.D.Cal.1990). In *Jensen,* the California Department of Health Services (DHS) sued the debtor to recover response costs expended pursuant to the state superfund statute. The *Jensen* court found the state superfund law and CERCLA to be equivalent, and granted summary judgment for the state, holding no claim arises for purposes of determining discharge until response costs are incurred. *Id.* at 706. The court rejected the debtor's argument that a dischargeable claim arose merely because there was a prepetition release of a hazardous substance:

Section 101(4) of the [Bankruptcy] Code defines "claim" as a "right of payment". This court does not understand how a CERCLA claim arises when the EPA has not yet earned the right to payment by incurring costs in cleaning up the toxic waste. The mere act of spilling toxic waste may give rise to other types of damage claims, i.e. personal injury or property damage, not to mention possible criminal penalties, but it does not cause a CERCLA claim to arise.

*Id.* The court found that this approach fit the goals of CERCLA and the bankruptcy code, since toxic release alone made any CERCLA liability of the debtor too remote and speculative.

Theoretically, what if the toxic waste at this site was never discovered? Or upon discovery, what if DHS had decided for whatever reasons not to pursue any remedial actions? Under either scenario no claim would have arisen because the DHS did not spend any of the state's superfund to clean up the site. Thus, the DHS's claim, pursuant to [the state statute] arose only after it incurred recoverable cleanup costs.

*Id.* at 703. The court reasoned that it would be too burdensome to require the EPA to file a proof of claim in every bankruptcy proceeding in which the debtor was a conceivable potentially responsible party, and that this would undermine the statutory goals of CERCLA. It noted that the Supreme Court, in *Midlantic Nat'l Bank v. New Jersey Dept. of Envtl. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), had judged environmental needs outweighed bankruptcy code provisions. *Jensen* rejected the application of *Chateaugay* outside the context of an ongoing bankruptcy proceeding, since *Jensen* involved a bankruptcy case in which the reorganization plan had already been confirmed. Only pre-confirmation CERCLA costs could be discharged.

In the present case, the government does not dispute that prepetition response costs are "claims" for bankruptcy purposes. The only costs incurred by the EPA before confirmation in this case were expenses for an emergency assessment of the Washington Avenue site conducted by MPCA in 1983, about $42,000, undertaken well before any formal investigation of the site or identification of potentially responsible parties. The government does not seek recovery of that $42,000 in this action. The costs it does seek were all incurred after confirmation of Taracorp's reorganization plan.

The mere release of a hazardous substance prior to the confirmation of a bankruptcy reorganization plan does not give rise to a CERCLA claim which is discharged by that confirmation. Taracorp

has not shown that the government held a contingent claim based on pre-confirmation contacts between the parties. Its motion to dismiss, construed as a motion for summary judgment because of matters submitted outside the pleadings, should be denied.[6]

### ORDER

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that the motion of Taracorp Industries, Inc., to dismiss, construed as a motion for summary judgment, is denied.

---

**6.** In light of this outcome, the remaining argu- ments of the parties need not be reached.