**AM INTERNATIONAL, INC., Plaintiff,**

**v.**

**DATACARD CORPORATION and Addressograph Farrington, Inc., Defendants.**

**DATACARD CORPORATION, Addressograph Farrington, Inc., and DBS, Inc., Counterclaimants,**

**v.**

**AM INTERNATIONAL, INC., Counterdefendant.**

No. 87 C 3408.

United States District Court, N.D. Illinois, E.D.

Oct. 5, 1992.

---

John W. Costello, W. Scott Nehs, Wildman, Harrold, Allen & Dixon, Michael Robert Enright, Arvey, Hodes, Costello & Burman, Chicago, Ill., Thomas W. Tinkham, Paul J. Scheerer, Steven J. Kinnunen, Becky Comstock, Scott H. Peters, B. Andrew Brown, Dorsey and Whitney, Minneapolis, Minn., for Data Card Corp. and Addressograph Farrington Inc.

Lewis S. Rosenbloom, Robert J. Labate, Winston & Strawn, Erica Lynn Dolgin, Schiff, Hardin & Waite, John William Watson, III, Gardner, Carton & Douglas, Chicago, Ill., for AM Intern., Inc.

## ORDER

NORGLE, District Judge.

Before the court are the objections of plaintiff-counterdefendant AM International, Inc. ("AMI"), defendants-counterclaimants DataCard Corporation and Addressograph Farrington, Inc., and counterclaimant DBS, Inc. (collectively "counterclaimants") to Magistrate Judge Ronald A. Guzman's Report and Recommendation ("Report"). For the following reasons, the court adopts the Report. The court denies AMI's motion for partial summary judgment in part and grants the motion in part.

## BACKGROUND

Pursuant to 28 U.S.C. § 636(b)(1), the court referred all pretrial matters to the Magistrate Judge. The Magistrate Judge issued a thirty-eight page Report (attached as Exhibit A) recommending that AMI's motion for partial summary judgment be denied as to counterclaimants' claims under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), and granted as to counterclaimants' nuisance, negligence, trespass, and strict liability claims.

AMI objects to the Magistrate Judge's adoption and recommendation of a "fair contemplation" standard for the determination of when CERCLA claims arise for the purpose of bankruptcy law.[1] Counterclaimants object to the portion of the Report (1) concluding CERCLA claims arise for the purposes of bankruptcy law upon the release or threat of release of hazardous substances into the environment and not upon the incurrence of response costs, (2) proposing factors for application of the "fair contemplation" standard, (3) granting AMI's summary judgment motion on counterclaimants' common law claims, and (4) determining counterclaimants were not entitled to notice before AMI's environmental liabilities were discharged.

## DISCUSSION

Upon the submission of a report and recommendation on a dispositive motion, the district judge shall make a de novo determination upon the record and may accept, reject, or modify the recommended decision. 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72(b). In making this decision, the district judge must look at all the evidence contained in the record and retains final authority over the determination of the dispositive motion. Delgado v. Bowen, 782 F.2d 79 (7th Cir.1986).

The court has completely reviewed the Report and arguments of counsel. The Court finds the Report to be thorough, accurate, and the decision proper. The court further finds both AMI's and counterclaimants' objections to be without merit.

In support of the Magistrate Judge's recommendation, the court makes the following additional observations on the issue of when CERCLA claims arise for purposes of bankruptcy dischargeability in light of the Seventh Circuit's recent decision in In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 974 F.2d 775 (7th Cir. 1992). In that case, the Seventh Circuit thoroughly discussed the relevant authori-

1. AMI also objects, in a footnote, to the Report's conclusion that the court must determine whether joint and several liability is appropriate in allocating liability for post-confirmation releases of hazardous substances. Nevertheless, "arguments raised in passing in a footnote are waived." Federal Labor Relations Auth. v. United States Dept. of the Navy, 975 F.2d 348, 352 n. 1 (7th Cir.1992); see also Fed.R.Civ.P. 72(b) (specific, written objection required).

ty. Not only did the court conclude that it is not necessary for a party to incur response costs before it possesses a CERCLA claim for purposes of bankruptcy law, *In re Chicago,* 974 F.2d at 785–86 (disposing of counterclaimants' objection on this point), but also held that a CERCLA claim does not arise for purpose of dischargeability under bankruptcy law upon the mere release or threatened release of hazardous substances, *Id.* at 784 (disposing of AMI's objection).

■ Though the court did not adopt a test directly on point with the facts of this case or with the Magistrate Judge's recommendation, the court made a point of noting the importance of knowledge or foreseeability on the part of potential CERCLA claimants in the determination of when a CERCLA claim arises. *Id.* at 784 n. 4. Specifically, the court stated,

> rather than adopting such a rule [that a claim arises when the party incurs response costs], or any rule, we explain below that when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim....

*Id.* at 786. Thus, if information before the potential CERCLA claimant had indicated that response costs were imminent, the case for dischargeability becomes greater. *See Id.* at 787 ("Not only did the information ... indicate that CERCLA response costs ... were imminent, but [the potential claimant] began sampling procedures [with regard to the contamination problem] ...").

■ As can be gleamed from the court's later discussion, the inquiry must center on whether the potential CERCLA claimant has "sufficient information to give rise to a claim or contingent CERCLA claim" before the consummation date of the bankruptcy. *Id.* at 787. Furthermore, the court cited with some level of approval a "fair contemplation" test. *See Id.* at 781 n. 2 (noting similar requirement in Second Circuit that claim must result from prepetition conduct fairly giving rise to claim) (citing *United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997, 1005 (2d Cir.1991) (citing *In re Chateaugay,* 112 B.R. 513, 521 (S.D.N.Y.1990))).

■ Accordingly, the court adopts the Magistrate Judge's recommendation that genuine issues of material fact exist with respect to the respective knowledge of all three counterclaimants therefore making summary judgment improper. *See* Fed. R.Civ.P. 56(c) (summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact ...."). The court does not adopt the "fair contemplation" test *per se,* but decides that the factors cited in the Magistrate Judge's discussion of such test are relevant to the inquiry framed by the Seventh Circuit.

■ Moreover, the Seventh Circuit's opinion also supports the Magistrate Judge's recommendation on the issue of whether DataCard was entitled to notice as an interested party at the time of the bankruptcy proceedings. *In re Chicago,* 974 F.2d at 788–89.

■ Accordingly, the Court adopts and incorporates Magistrate Judge Guzman's Report and Recommendation and the holdings contained therein pursuant to 28 U.S.C. § 636(b)(1).

## CONCLUSION

For the above stated reasons, AMI's motion for partial summary judgment is denied as to the claims arising under CERCLA and is granted in favor of AMI as to counterclaimants' breach of warranty, misrepresentation, nuisance, negligence, trespass, and strict liability claims.

IT IS SO ORDERED.

## EXHIBIT A

TO: HONORABLE CHARLES R. NORGLE, SR., JUDGE
UNITED STATES DISTRICT COURT

HONORABLE JUDGE:

## REPORT AND RECOMMENDATION

of Magistrate Judge Ronald A. Guzmán

Pending is AMI's motion for summary judgment. This is an action in which the Plaintiff AM International, Inc. (AMI) seeks injunctive and declaratory relief as to the discharge of pre-confirmation claims in it's Chapter 11 proceeding. AMI contends it is entitled to a declaration that it's debt owed to Defendants–Counterclaimants Data Card Corporation (Data Card), DBS Inc. (DBS), and Addressograph Farrington Inc. (AFI) for AMI's pre-confirmation release of hazardous materials at the Holmesville facility (described below) was discharged in it's Chapter 11 proceeding. AMI has filed a two count complaint against Defendants–Counterclaimants (Counterclaimants) Data Card, DBS, and AFI. This court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1332; Section 7002(a)(1)(A), (B) for the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(A), (B); and Sections 107(a), 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9607(a), 9613(b). Counterclaimants have filed an eleven count Amended Joint Answer and Counterclaim, seeking response costs for the cleanup of the facility.

AMI has moved for partial summary judgment on the ground that the Counterclaimants' claims arose prior to the bankruptcy confirmation and such claims were discharged in bankruptcy.[1] Counterclaimants submitted a Memorandum in Opposition to Summary Judgment, on the basis that CERCLA claims arise when response costs are incurred, and thus were post-confirmation in this case, prohibiting their discharge in bankruptcy. For the reasons listed below, it is hereby recommended that AMI's motion for summary judgment be denied.

## BACKGROUND FACTS

This action for injunctive and declaratory relief was commenced by AMI after Data Card discovered hazardous substances in the soil and groundwater at the Holmesville facility.[2] From 1959 until November 1981, AMI owned a manufacturing facility located in Holmesville, Ohio.[3] During this period of time, both AMI's Addressograph and Multigraphics divisions conducted manufacturing operations at the Holmesville facility.[4] At the Holmesville facility, an above-ground tank farm was maintained for the mixing of Blankrola, a solvent sold by the Multigraphics division for the cleaning of multilith duplicating machines.[5] The tank farm consisted of nine tanks ranging in size from 6,000 to 8,000 gallons. Two of the tanks were used for the mixing of Blankrola. Six of the tanks were used for storage of tetrachloroethylene and naphtha, the two raw material constituents of Blankrola.[6] A pump house was located at the tank farm from which AMI employees controlled the mixing of Blankrola through the opening and closing of valves.[7] Statements by former employees of AMI and Counterclaimants reveal that at least one major spill of a couple thousand gallons of Blankrola and its constituent chemicals occurred prior to 1980 at the tank farm during the course of mixing operations.[8]

By Purchase and Sale Agreement, dated November 30, 1981 ("1981 Agreement")

---

1. See Counterclaimants Memorandum In Opposition to AMI's Motion for Summary Judgment, page 2 and AMI's reply brief, page 1.

2. Plaintiff's "Statement of Facts As To Which There Is No Genuine Issue", ¶ 36; Counterclaimant's "Statement of Genuine Issues of Data Card Corporation, DBS, Inc. and Addressograph Farrington, Inc.", ¶ 28, 29. Hereinafter, Plaintiff's "Statement of Facts As To Which There Is No Genuine Issue" will be referred to as AMI's Stat. and Counterclaimant's "Statement of Genuine Issues of Data Card Corporation, DBS, Inc.

and Addressograph Farrington, Inc." will be referred to as Counterclaimants' Stat.

3. AMI's Stat. ¶ 1.

4. AMI's Stat. ¶ 2.

5. AMI's Stat. ¶ 3.

6. AMI's Stat. ¶ 4.

7. AMI's Stat. ¶ 5.

8. AMI's Stat. ¶¶ 7, 9.

DBS acquired the Holmesville facility and the assets of the Addressograph division from AMI and continued Addressograph operations at the facility through its subsidiary AFI.[9] In the 1981 Agreement, AMI extended an express warranty to DBS that the Holmesville facility was free and clear of any and all claims, except certain listed claims not including ones arising from the contamination of the Holmesville facility by hazardous substances.[10] In the 1981 agreement, AMI extended an express written warranty that the Holmesville facility was in compliance with all laws and regulations.[11]

Under the terms of the 1981 Agreement, AMI leased a portion of the Holmesville facility, including the above-ground storage tanks, and continued operations of its Multigraphics division.[12] At the time of the acquisition, some AMI employees were given the option to stay with AMI or accept employment with AFI.[13] A number of AMI personnel who had been employed by AMI in mixing operations at the tank farm chose to become employees of AFI.[14]

After the DBS acquisition and until Multigraphics operations ceased in 1985, both AMI and AFI participated in maintenance activities at the tank farm. Who controlled the maintenance activities at the Holmesville facility is disputed. AMI contends that "AFI provided maintenance services" such as furnishing electricity, heat and lighting, mowing the grass, and some assisting in equipment repairs at the Holmesville facility.[15] Counterclaimants assert that while AFI provided the services listed above, AMI "maintained" the tank farm. Counterclaimants assert that AFI did not agree to "maintain the tank farm".[16]

On April 14, 1982, AMI commenced its Chapter 11 reorganization case No. 82 B 04922 by filing a voluntary petition under Section 301 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois.[17] Prior to the deadline for filing claims in AMI's Chapter 11 case, DBS and AFI were notified of the commencement of the bankruptcy and DBS filed proofs of claims against AMI based upon the 1981 Agreement.[18] Since it had no association with AFI, DBS or AMI prior to 1986, Data Card was not given notice of AMI's pending bankruptcy.[19] Data Card did not purchase the stock of DBS until August 25, 1986. On November 7, 1983, AMI filed its objection and counterclaim to DBS' claim. On or about August 20, 1984, DBS, AFI and AMI entered into a Settlement Agreement ("Settlement Agreement"), approved by order of court pursuant to which the parties agreed to release each other from all claims, demands, and causes of action which each had or may have against the other on the date of the Settlement Agreement.[20]

Prior to confirmation of AMI's Plan of Reorganization on September 11, 1984, no

---

9. A fact at issue is whether DBS acquired the tank farm in the acquisition of the Holmesville facility. This is a fact which is not material to the issues to be decided before this court. AMI contends that DBS acquired the tank farm in 1981, and that AMI leased the above-ground storage tanks from DBS to continue the operations of its Multigraphics division. (AMI's Stat. ¶¶ 10, 15.) Counterclaimants contend that under the terms of the 1981 agreement, AMI retained ownership of the tank farm and leased the grounds where the tank farm was located from DBS. (Counterclaimants' Stat. ¶¶ 10, 15.)

10. Counterclaimants' Stat. ¶ 52.

11. Counterclaimants' Stat. ¶ 53.

12. As mentioned in footnote 8, whether DBS acquired the tank farm is at issue. AMI's Stat. ¶ 15.

13. AMI's Stat. ¶ 12; Counterclaimants' Stat. ¶ 12.

14. AMI's Stat. ¶ 13.

15. AMI's Stat. ¶ 16.

16. Counterclaimants' Stat. 16, 17. AMI's Stat. ¶ 17.

17. AMI's Stat. ¶ 18.

18. AMI's Stat. ¶ 19.

19. Counterclaimants' Stat. ¶ 39.

20. Complaint ¶ 12.

one from DBS, AFI or AMI ever questioned Mr. Bill Kuchta (in charge of Multigraphics operations at the tank farm for AMI) concerning any environmental problems associated with operations of AMI at the Holmesville facility tank farm.[21] Furthermore, DBS, AFI, and AMI did not inquire of Mr. John Ford about historical environmental matters associated with the Holmesville facility before 1981.[22] Mr. Ford was responsible for environmental matters at the Holmesville facility for AMI since 1980, and went to work for AFI in the same capacity in 1981.[23] AMI claims it did not know of any environmental liabilities in connection with its ownership and/or operation of the Holmesville facility prior to 1986.[24] Both during the pendency of AMI's bankruptcy (1982–1984) and after the confirmation of AMI's Reorganization Plan, releases of tetrachloroethylene and naphtha occurred at the tank farm at the Holmesville facility.[25] On September 11, 1984, AMI's Plan of Reorganization in its Chapter 11 reorganization case was confirmed.[26]

In 1985, AMI ceased its operations at and vacated the Holmesville facility.[27] In late 1985 and early 1986, Data Card commenced a due diligence investigation at the Holmesville facility as part of its proposed acquisition of AFI operations.[28] The due diligence investigation included an analysis of environmental concerns. Consistent with Data Card's practices when contemplating facility acquisitions of that size, as part of the environmental evaluation, Data Card retained an environmental engineering firm, Samsel Services Company ("Samsel") to conduct soil and ground water sampling at the Holmesville facility.[29] While AMI contends that Data Card had identified the tank farm at Holmesville to be a potential environmental problem area before the investigation occurred, Counterclaimants contend that Data Card relied on Samsel to determine the scope of the investigation of the Holmesville facility.[30]

In March and April of 1986, Samsel conducted soil and ground water sampling in and around the tank farm. The highest concentrations of tetrachloroethylene and naphtha were around the pump house and the southwest corner of the concrete tank pad.[31] After Samsel discovered that the soil and ground water were contaminated, Mr. Ford talked with two current AFI employees, Mr. Fitzpatrick and Mr. Proper, who had responsibility for the mixing operations for AMI prior to becoming employed by AFI in 1981. These employees recounted two spill events which occurred before 1980 at the tank farm.[32] Ford did not have knowledge of the spills of tetrachloroethylene and naphtha until the Samsel investigation in 1986.[33]

Upon identification of constituents of Blankrola in the soil and ground water, Data Card notified AMI of the contamination by letter dated April 30, 1986.[34] AMI personnel subsequently collected additional soil and ground water samples to confirm the validity of the Samsel results.[35] While the reliability of the results obtained by the AMI employees is questioned by Counterclaimants, analyses of these samples confirmed the existence of contamination in

21. Counterclaimants' Stat. ¶ 20. AMI's Stat. ¶ 6.

22. AMI's Stat. ¶ 21; Counterclaimants Stat. ¶ 21.

23. AMI's Stat. ¶ 14.

24. Counterclaimants' Stat. ¶ 51.

25. Counterclaimants' Stat. ¶ 47.

26. Counterclaimants' Stat. ¶ 49.

27. AMI's Stat. ¶ 22.

28. AMI's Stat. ¶ 23.

29. AMI's Stat. ¶ 25.

30. AMI's Stat. ¶ 26; Counterclaimants' Stat. ¶ 26.

31. AMI's Stat. ¶¶ 27–29; Counterclaimants' Stat. ¶¶ 28, 29.

32. AMI's Stat. ¶ 31; Ford Transc. p. 72–75.

33. Ford Transc. p. 73.

34. AMI's Stat. ¶ 32; Complaint ¶ 14.

35. AMI's Stat. ¶¶ 33, 34.

the soil and ground water at the facility.[36] By letter dated May 1, 1986, Data Card notified the Ohio Environmental Protection Agency that it believed that the soil and ground water at the Holmesville facility were contaminated.[37] On August 25, 1986, Data Card purchased the stock of DBS and became the owner of the Holmesville facility.[38] By letter dated January 23, 1987, Data Card informed AMI that Data Card had expended $35,644.95 for "response actions" associated with the contamination of the soil and ground water at the Holmesville facility.[39] The purpose of the letter was to provide a statutorily required 60–day notice to AMI of Counterclaimants' intent to bring a civil action against AMI pursuant to:

A. Section 505 of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. section 1365;

B. Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. section 6972; and

C. Sections 107 and 310 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. Section 9607, PL 99–499 Super Fund Amendments and Reauthorization Act of 1986, October 17, 1986.[40]

As of December 1991, Data Card has incurred response costs in excess of $150,000 in connection with the release of hazardous substances at the Holmesville facility.[41]

On March 20, 1987, AMI filed suit against Data Card and AFI. Count I alleges that the claim of DBS against AMI arose on or about November 30, 1981, when the Holmesville facility was sold to DBS and continued to arise to and including August 20, 1984, the date of the settlement agreement. AMI alleges that it was discharged from any debt which arose before the date of confirmation of bankruptcy, September 11, 1984 and seeks injunctive relief to that effect. Count II seeks declaratory relief to the effect that the debt incurred by AMI with respect to Counterclaimants before the confirmation date has been discharged under the Chapter 11 reorganization.

## DISCUSSION

In AMI's Reply Brief in Support of It's Motion for Summary Judgment, AMI asserted it is moving for partial summary judgment pursuant to Rule 56(a). Subdivisions (a) and (b) of Rule 56 contemplate that a motion for summary judgment may be made upon all or a part of a claim.

The United States Supreme Court set forth the following principles to be applied in ruling on a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. This materiality inquiry is independent of and separate from the question of the incorporation of

---

**36.** AMI's Stat. ¶ 36; Counterclaimants' Stat. ¶ 36.

**37.** Complaint ¶ 15.

**38.** Complaint ¶ 16.

**39.** Complaint ¶ 17.

**40.** Complaint ¶ 17.

**41.** Counterclaimants' Stat. ¶ 58.

the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion or categorizing of factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

.        .        .        .        .

More important for present purposes summary judgment will not lie if the dispute about a material is "genuine." that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also Celotex Corporation v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986). The Court went on to say that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, or is not more than a scintilla, a summary judgment may be granted. The substantive evidentiary standard of proof that would apply at a trial on the merits applies on a motion for summary judgment. *Id.*

Further, Local Rule 12(n) requires a party opposing a motion for summary judgment to file, in addition to the evidentiary materials allowed by Rule 56(e), a response listing the factual assertions by the movant with which the opponent disagrees. *Bell, Boyd, & Lloyd v. Tapy,* 896 F.2d 1101, 1102 (7th Cir.1990). The list must be supported by specific references to the evidentiary materials relied on and must set forth any additional facts that require denial of summary judgment, also supported by specific references in the record. Any facts asserted by the movant and not contradicted in the manner specified by the Rule are deemed admitted pursuant to Local Rule 12(m) and (n). *Id.,* at 1102.

Therefore, this court must determine whether Counterclaimants have offered any evidence to create a genuine issue of fact as to AMI's summary judgment claim against Counterclaimants. In doing so, this court will examine Counterclaimants' evidence in it's most favorable light.

At the outset, Counterclaimants have argued that AMI's motion for summary judgment should be denied for three reasons. First, AMI released hazardous substances into the environment of the Holmesville facility after its bankruptcy confirmation, thus exposing AMI to joint and several liability for all cleanup costs even under its expanded definition of contingent liability. Second, Data Card had no notice of AMI's bankruptcy and, as admitted by AMI in its brief, notice of bankruptcy is a minimal due process requirement of claim preclusion. Finally, since DBS and AFI had no knowledge of environmental damage and had spent no money in a cleanup until after the confirmation of AMI's reorganization plan, they had no claim which could be discharged in AMI's bankruptcy. Each of Counterclaimants' arguments will be addressed in turn.

## AMI'S RELEASE OF HAZARDOUS MATERIALS SUBSEQUENT TO CONFIRMATION DOES NOT PRECLUDE SUMMARY JUDGMENT

Counterclaimants first argue that AMI's motion for summary judgment must be de-

nied because the distinction made by AMI between releases occurring pre-confirmation and post-confirmation is irrelevant. Counterclaimants contend that even if this court were to adopt AMI's argument, that a CERCLA claim arises for purposes of bankruptcy, upon the release of a hazardous substance, this court cannot dismiss the CERCLA claim against AMI, so long as there was any release of a hazardous substance from the tank after the confirmation of AMI's reorganization plan. Counterclaimants argue that CERCLA imposes joint and several liability upon every responsible party, and therefore a party partially responsible for the contamination of a facility, at a subsequent point in time, can be held liable for any or all remediation costs. Counterclaimants point out that AMI has conceded that a factual dispute exists as to whether spills occurred at the tank farm after AMI's confirmation. This concession, Counterclaimants argue raises a genuine issue of material fact which precludes summary judgment.

AMI replies that it does not seek judgment barring recovery for any activities conducted at any time after September 11, 1984, the date of AMI's confirmation in bankruptcy. AMI argues that the dispute before this court is not properly one for cost recovery where the court would be asked to impose joint and several liability, rather this claim can only be one for contribution pursuant to section 113 of CERCLA, 42 U.S.C. § 9613(f). This section provides as follows:

### Contribution

#### (1) Contribution

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.

As to whether a post-confirmation release of hazardous substances precludes summary judgment as to a party's liability on pre-confirmation releases, I have concluded that it does not. My conclusion is premised on the legal authority set forth in two cases: *In re Chateaugay*, 944 F.2d 997, 999 (2d Cir.1991) and *In re National Gypsum Company* 139 B.R. 397 (N.D.Tex. 1992).

In *Chateaugay*, LTV, a diversified steel, aerospace, and energy corporation filed a bankruptcy petition under Chapter 11. LTV's schedule of liabilities included 24 pages of claims, labeled "contingent" that were held by the Environmental Protection Agency. *In re Chateaugay*, 944 F.2d 997, 999 (2d Cir.1991). The EPA then filed a proof of claim for approximately $32 million, representing response costs incurred pre-petition at fourteen of LTV's sites. *Id.* at 999. With respect to the contingent claims, i.e. those for which response costs had not been incurred prepetition, LTV informed the government that LTV expected the confirmation of its reorganization to discharge all obligations, including those for response costs that were incurred post-confirmation. *Id.* at 1000. In disagreement with that position, the government brought an adversary proceeding for a declaratory judgment that response costs incurred post-confirmation are not dischargeable because they do not arise from pre-petition claims. *Id.* at 1000. In the government's view, it did not have a "claim" within the meaning of the Bankruptcy Code, 11 U.S.C. § 101(4) (1984) for reimbursement of post petition CERCLA response costs.

The District Court ruled substantially in favor of LTV. Judge Sprizzo did not go quite so far as to include response costs claimed to be discharged based on any of LTV's pre-petition conduct related to the

injury, a position that would have included LTV's pre-petition conduct of placing hazardous substances in sealed containers, followed by releases of the substances into the environment years after confirmation. However, Judge Sprizzo, agreed with LTV to the extent of ruling that an obligation to reimburse [the] EPA for response costs is a dischargeable claim whenever based upon a pre-petition release or threat of release. *Id.* at 1000. This ruling covered releases that occurred pre-petition, even though they had not then been discovered by the EPA (or anyone else). *Id.* at 1000.

However, the court in *National Gypsum Company,* 139 B.R. 397 (N.D.Tex, 1992) noted that the *Chateaugay* court utilizes so broad a definition of claim that it encompasses costs "that could not 'fairly' have been contemplated by the EPA or the debtor pre-petition." *National Gypsum,* 139 B.R. 397–407. The *National Gypsum* court was concerned about the fact that in making so broad a definition for claim, the Code's objective of "fresh start" was given preference over CERCLA's objective of environmental clean up. To eliminate the possibility of a broad-brush application of *Chateaugay,* in which discharge of claims would occur whether or not they were contemplated by the parties, the *National Gypsum* court defined a test. This test limits the discharge of claims relating to pre-petition conduct resulting in a release or threat of release of hazardous materials to cases in which the costs were fairly contemplated by the parties. *National Gypsum,* 139 B.R. 397–407 (N.D.Tex.1992). The court decided that the "[t]he only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between cost associated with pre-petition conduct resulting in a release or threat of release that could have been 'fairly' contemplated by the parties and may therefore be discharged, and those that could not have been 'fairly' contemplated by the parties." *Id.*

Based on the relevant authority in *Chateaugay* and *National Gypsum* it is clear that AMI's distinction between releases occurring pre-confirmation and post-confirmation is relevant and the fact that there

was a spill subsequent to AMI's confirmation does not automatically preclude summary judgment if the releases which resulted in the clean up costs were fairly contemplated by the parties. Therefore, the fact that there was a post-confirmation spill does not automatically preclude AMI's summary judgment as to pre-confirmation spills.

As to AMI's argument, that the case at bar is not properly one for joint and several liability, it is true that courts "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). This contribution provision, however, does not preclude the possibility that this case may turn out to be one for joint and several liability.

In general, CERCLA does not expressly provide for joint and several liability. Congress expressly left to the courts the determination of what standard of liability to impose under CERCLA, based on a case by case basis. *National Gypsum* at 413 *quoting* H.Rep. No. 253(I), 99th Cong.2d Sess. 74, *reprinted* in 1986 U.S.Code Cong. & Adm. News 2835, 2856. Subsequently, however, in enacting the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Congress endorsed the standard of joint and several liability imposed by the seminal case of *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1982). *National Gypsum* at 413. In determining the scope of liability, the *Chem–Dyne* court followed the strict approach advocated by the Restatement (Second) of Torts. Under this approach, the burden of proof as to apportionment of harm is on the defendant; absent a showing of divisibility, each defendant is jointly and severally liable for the entire harm. *National Gypsum* at 413; *Chem–Dyne,* 572 F.Supp. at 808.

Since *Chem–Dyne,* courts have uniformly imposed joint and several liability where the harm has been indivisible. *National Gypsum* at 413; *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1990); *O'Neil v. Picillo,* 883 F.2d 176, 178–79 (1st Cir.1989); *United States v. Monsanto Co.,*

858 F.2d 160, 171–72 (4th Cir.1988). Even courts critical of the inequitable results of joint and several liability have applied this standard to the circumstances before them. *National Gypsum* at 414; *See e.g. O'Neil,* 883 F.2d at 178; *United States v. A & F Materials Co.,* 578 F.Supp. 1249, 1256 (S.D.Ill.1984).

In order to avoid joint and several liability, the debtor must establish that (1) the environmental injury is in fact capable of divisibility; and (2) a reasonable basis exists for such apportionment. *National Gypsum* at 414; *See Chem–Dyne,* 572 F.Supp. at 811; *United States v. Miami Drum Services, Inc.,* 25 E.R.C. 1469, 1474, 1986 WL 15327. (S.D.Fla.1986). Divisibility of harm is a question of fact to be determined by presentation of evidence. *National Gypsum* at 414; *United States v. Thomas Solvent Co.,* 714 F.Supp. 1439, 1448 (W.D.Mich.1989).

The facts in this case reveal that the Samsel report found the constituent elements of Blankrola in the contaminated groundwater and soil. Whether these chemicals were the only chemicals constituting the contamination or whether chemicals having absolutely nothing to do with the production of Blankrola were present is unclear. Obviously, though, Counterclaimants' argument that this case may be one of joint and several liability is well taken and this court at this stage certainly cannot make a determination as to divisibility or apportionment. I, therefore, recommend that the Court reject counterclaimants' argument that the past confirmation contamination automatically precludes summary judgment in favor of AMI. Rather, I recommend the Court find that the effect of the post confirmation release depends upon the divisibility of the harms and that as to this issue, there remain substantial factual questions to be resolved.

THE FACT THAT DATA CARD RECEIVED NO NOTICE OF AMI'S PENDING BANKRUPTCY FAILS TO RAISE A GENUINE ISSUE OF FACT OR LAW

Counterclaimants next contend that AMI's partial motion for summary judgment must be denied as to Data Card because Data Card did not have notice or actual knowledge of AMI's pending Chapter 11 bankruptcy. This lack of notice and/or actual knowledge, Data Card argues, deprives Data Card of its rights under due process. Data Card relies on *In re Penn Cent. Transp. Co.,* 771 F.2d 762 (3d Cir.1985) *cert. denied,* 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 576 (1985) to support their proposition that due process requires that a creditor must have notice or actual knowledge of the debtor's bankruptcy case before the creditor's claim is discharged. *Id.*

In *In re Penn Cent. Transp. Co.,* plaintiffs Pinney and Litton alleged that although they received notice of Penn Central's reorganization proceedings, their claims now before the court, were based on antitrust conspiratorial acts which were fraudulently concealed from plaintiffs. Plaintiffs argued that the reorganization process of the bankruptcy code was dependent on "proper" notification to creditors and other interested parties. Plaintiffs argued that their notice was not proper. The court then reviewed the requirements of due process noting:

In *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15 [70 S.Ct. 652, 657, 94 L.Ed. 865] (1950) the Supreme Court stated that an elementary and fundamental requirement of due process in any proceedings which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonable to convey the required information ... and it must afford a reasonable time for those interested to make their appearance ... But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied.

(citation omitted).

The facts before this court reveal that Data Card did not purchase the stock of

DBS, Inc. the parent holding company of AFI until August of 1986. Thus, Data Card did not become an interested party entitled to notice under the Bankruptcy Code, until it acquired the property in 1986. At the time AMI filed for bankruptcy in 1982, and when AMI's reorganization plan was confirmed in 1984, there was absolutely no basis for AMI to perceive Data Card as an interested party or Data Card to assert a claim against AMI. Thus, Data Card was not an interested party who was entitled to notice at the time of AMI's bankruptcy and by reason of its subsequent ownership of all DBS stock, the knowledge of AFI and DBS is imputed to Data Card.

Further, AMI is correct in arguing that the proposition that Data Card's argument cannot be squared with the Bankruptcy Code. A debtor that provides notice to all parties who may have claims against the debtor relating to a piece of property cannot lose the benefit of its discharge because another party acquires title to the property at some future date. The efficacy of the debtor's discharge would then be subject to subsequent conveyances of the property over which the debtor had no control. This scheme would end-run around the policies underlying the Bankruptcy Code which provide for a "fresh start" to the debtor. Thus, it is inappropriate for Data Card to contend that the motion for summary judgment should be denied because Data Card was never given notice.

### A CLAIM FOR PURPOSES OF THE BANKRUPTCY ACT ARISES UPON THE RELEASE OF HAZARDOUS SUBSTANCE

The primary issue raised by AMI in this motion for summary judgment is whether, for purposes of bankruptcy, Counterclaimants' environmental claims arose before the confirmation of AMI's reorganization plan. AMI argues that its liability hinges on when the events that gave rise to claims, the alleged contamination of soil and groundwater and the sale of the Holmesville facility occurred. Any claims based

on event which occurred pre-confirmation were discharged in the AMI bankruptcy case because the Bankruptcy Code defines debt as "liability on a claim". 11 U.S.C. § 101(11). Section 101(4) of the Code and the cases define "claim" very broadly to include contingent and unliquidated claims. *See In re Edge,* 60 B.R. 690, 692 (Bkrtcy. M.D.Tenn.1986). (Legislative history confirms that Congress intended the broadest definition for 'claim' in bankruptcy. "By this broadest possible definition ... the bill contemplates that all legal obligations of the debtor no matter how remote or contingent will be able to be dealt with in the bankruptcy case." H.R.Rep. No. 595, 95th Cong., 2d Sess. 309 (1979), *reprinted* in 1978 U.S.Code Cong.Ad.News 5963, 6266.

Counterclaimants, however, contend that the contamination was not discovered until after the confirmation of AMI's reorganization plan, and that therefore such claims could not have been discharged in bankruptcy. Counterclaimants further argue that the mere release of a hazardous substances is insufficient to give rise to a CERCLA claim because response costs are a necessary element of such claims. Because Data Card's response costs were not incurred until *after* the confirmation, the claim could not have been discharged by AMI's reorganization. Counterclaimants argue that AMI's argument stretches the definition of contingent claim to a new extreme and that no court has held that CERCLA liability should be discharged when the debtor fails to disclose its potential CERCLA liability in the bankruptcy proceeding.

Counterclaimants rely on two cases, the *United States v. Union Scrap Iron & Metal,* 123 B.R. 831 (D.Minn.1990) and *Sylvestor Bros. Dev. Co. v. Burlington Northern,* 133 B.R. 648 (D.Minn.1991), to support their position. In *Union Scrap,* the court refused summary judgment of a bankrupt co-defendant, Taracorp, and stated the issue of when CERCLA liability arises for purpose of bankruptcy as:

Should a party's liabilities for environmental damage be discharged in bankruptcy when the harm was done prepetition, but it was not known at the time

to the [creditor] that the party was a responsible party, and when CERCLA liability could not be incurred until after the bankruptcy reorganization was complete?

The court, relying on *In re UNR Industries, Inc.,* 29 B.R. 741, 745–46 (Bankr. N.D.Ill.1983) held that "CERCLA provides no basis for [the debtor's] position that the mere release of a hazardous substance is sufficient to create a legal obligation constituting a claim in bankruptcy." 123 B.R. at 835–36. Judge Murphy, then concluded that "[t]he EPA could not have a bankruptcy claim based on CERCLA until it had incurred response costs." 123 B.R. at 836. *Sylvestor Bros.,* also a Judge Murphy decision, employed a similar legal analysis.

Counterclaimants argue that CERCLA the relevant substantive non-bankruptcy law in this case, as in the above cases, should be applied to determine when a claim arises for purpose of bankruptcy. To establish a claim under CERCLA, four elements must be established: (1) there must be a facility; (2) there must be a release or threatened release of hazardous substances at the facility; (3) there must be a responsible person, as defined under 42 U.S.C. § 9607(a); and (4) the non-government claimant must have incurred necessary cost of response in responding to the release at the facility. *United States v. Aceto Agriculture Chems. Corp.,* 872 F.2d 1373, 1378–79 (8th Cir.1989).

AMI replies that all four elements of the CERCLA test do not need to be present and that the legal analysis applied in *Union Scrap* and *Sylvester Brothers* is incorrect. This is because both subsection 502(c) allows for the estimation of "contingent or unliquidated" claims and subsection 502(e) disallows, but does not except from discharge, contingent claims for contribution and reimbursement. AMI further argues that Section 1141(d)(1)(A) of the Bankruptcy Code provides that the confirmation of a Chapter 11 plan or reorganization discharges the debtor from all debts. AMI, citing *In re Jensen,* 127 B.R. 27 (9th Cir.BAP 1991), contends that in determining when a claim in bankruptcy arises, the court should focus on when the debtor's conduct occurred not when the harm becomes known or discovered.

In *Jensen,* the State of California attempted to recover from a Chapter 7 debtor cleanup costs related to contamination that had occurred pre-petition. The court rejected the argument that the claim did not arise until cleanup costs had been incurred, holding that "claims in bankruptcy arise based upon the debtor's conduct ..." 127 B.R. at 33. Because Jensen's conduct, its release of hazardous materials, had occurred pre-bankruptcy, the state's claim was deemed discharged. *Id.*

In accord with *Jensen* is *In re Chateaugay Corp.,* 112 B.R. 513 (S.D.N.Y.1990), *aff'd* 944 F.2d 997 (2d Cir.1991). The *Chateaugay* court distinguished claims arising from a pre-bankruptcy release of hazardous waste from those that arise from a post-bankruptcy release. As reasoned by the Court:

Where ... there has been a pre-petition release or threatened release of hazardous waste, there does exist an event that would render any claims arising from the circumstance dischargeable pursuant to the broad definition of "claim" set forth in the Bankruptcy Code.

112 B.R. at 522. The court in recognizing the underlying environmental laws, concluded:

The Court cannot accept the government's argument that any future environmental obligations are not dischargeable merely because a CERCLA cause of action fully arises only after a review had been made, a remedy chosen, and costs incurred. So long as there is a pre-petition triggering event, i.e. the release or threatened release of hazardous waste, the claim is dischargeable, regardless of when the claim for relief may be ripe for adjudication.

*Id.* at 522.

Both the *Jensen* and *Chateaugay* decisions relied on *In re Johns–Manville Corp.,* 57 B.R. 680 (Bankrtcy.S.D.N.Y.1986) in reaching their conclusion that future environmental debts are dischargeable.

*Johns–Manville* involved a third-party claim filed against the debtor post-petition which related to building materials that the debtor had sold pre-petition. After the debtor's bankruptcy filing, the building material proved to be defective, resulting in claims by the building owner of the building against the contractor and developer. Those parties sought indemnification and contribution from the debtor. The claimants, in the *Johns–Manville* case, argued that their claims arose post-petition and thus were not subject to the automatic stay. The claimants relied on *In re Frenville Co.*, 744 F.2d 332 (3rd Cir.1984), which held that a claim is a post-petition claim if the right to payment that the claim represents did not arise under state law or non-bankruptcy federal law, as the case may be, until after the bankruptcy filing. The *Johns–Manville* court declined to follow the *Frenville* decision, finding that *Frenville* undermined the broad definition of claim intended by Congress and that *Frenville* would frustrate the process of channelling claims against a debtor into a single forum. 57 B.R. at 690. The *Johns–Manville* court concluded, in determining when a claim arises, that the focus must be on the actions or omissions of the debtor that ultimately gave rise to the claim, and not on when third parties might obtain rights of indemnification or contribution. 57 B.R. at 690.

Counterclaimants counter that *Jensen* and *Chateaugay* are both inapposite because they both were cases in which the question of discharge of CERCLA liability arose in the context of ongoing bankruptcy proceedings where the creditor could still file a claim. In addition, the debtor, in both cases, disclosed its CERCLA liability in the bankruptcy proceedings, and consequently the creditor had actual knowledge of the debtors' CERCLA liability before the bankruptcy plan was confirmed. These factual distinctions, Counterclaimants contend, cut to the crucial issues identified by the District Court of Minnesota in *Union Scrap* and *Sylvestor Bros.*

Before moving to the merits of both parties' arguments, I would like to comment that I do not agree with Counterclaimants' characterization of the proceedings in *Jensen*. *Jensen* was a Chapter 7 case, which had been closed for 5 years before the discharge issue came before the court. Thus, this court cannot agree with Counterclaimants' statements that the *Jensen* case arose in the context of an ongoing bankruptcy proceeding where the creditor could still file a claim. Further, in finding that CERCLA claims arise for bankruptcy purposes upon the release of hazardous materials neither the *Jensen* nor *Chateaugay* courts, explicitly or implicitly suggested the pendency of the bankruptcy proceeding was at all relevant in their determinations.

Now to the issue of when a claim arises under CERCLA for purposes of bankruptcy. A logical approach has been set forth in *Johns–Manville Corp.*, 57 B.R. 680, 692 (Bankr.S.D.N.Y.1986). In *Manville* the court looked to both contract law and tort law to decide when a "claim" arises. Under tort law, a tort-feasor's pre-petition conduct causing post-confirmation manifestation of injury in the tort victim can give rise to a claim. Some courts have ruled that in the absence of pre-petition manifestation of injury, no claim exists. (*See, Schweitzer v. Consolidated Rail Corp.*, 758 F.2d 936, 944 (3d Cir.1985); *In re Forty–Eight Insulations, Inc.*, 58 B.R. 476, 477 (Bankr.N.D.Ill.1986).) Other courts have ruled that even in the absence of pre-petition manifestation of injury, a claim does exist due to the tort-feasor's pre-petition conduct. (*See, In re Johns–Manville Corp.*, 57 B.R. 680, 686–688 (Bankr. S.D.N.Y.1986); *In re Edge*, 60 B.R. 690 (Bankr.M.D.Tenn.1986).) Under contract law, pre-petition conduct between parties can establish a situation in which upon occurrence of an event in the future, one party has to fulfill a promise to the other party. That is, a "contingent claim" is one in which the "debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of

the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr. S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981).

In the context of liability under CERCLA, the application of neither tort law nor contract law precisely fits, although the latter seems to be a closer fit. While the relationship between the EPA (or another party) and a U.S. corporation is more defined than that existing between a potential tort victim and a tort-feasor, it is not as well defined as a contractual relationship. As the court noted in *Chateaugay*, "We need not decide how the definition of 'claim' applies to tort victims injured by prepetition conduct ... we deal here with the far more manageable problem of sums ultimately to be owed to EPA [or some private party] at such times as it incurs CERCLA response costs." *Chateaugay* 944 F.2d at 1004. The court likened that relationship between EPA [or as in the present case, a party that has incurred response costs] and the debtor as more like a contractual relationship than the relationship that arises in the tort situation. Such a relationship brings contemplation of contingencies which bring many ultimately maturing payment obligations based on pre-petition conduct within the definition of "claims". Thus, such claims based on prepetition conduct would be considered "contingent," and not outside the Code's definition of "claim."

While this court follows much of the *Chateaugay* court's reasoning, some interpretations which take *Chateaugay* to it's logical conclusion may give too broad a meaning to the word claim, and a recent case,[42] while adopting much of the *Chateaugay* court's reasoning, tempers the breadth of the definition of claim which may be discharged. *In re National Gypsum Company*, 139 B.R. 397, 406 (N.D.Tex.1992). The court in *National Gypsum* noted that the *Chateaugay* court utilizes so broad a definition of claim that it encompasses costs "that could not 'fairly' have been contemplated by the EPA or the debtor pre-petition." *National Gypsum* at 406. The *National Gypsum* court was concerned about the fact that in making so broad a definition for claim, the Code's objective of "fresh start" was given preference over CERCLA's objective of environmental clean up.

It does not appear from a careful reading of the *Chateaugay* opinion that the court intended discharge of all costs relating to the debtor's pre-petition conduct resulting in a release or threat of release, whether or not these costs were fairly contemplated by the parties at the time of the bankruptcy[43]. Yet, the *Chateaugay* court provided no means of distinguishing between those claims that were contemplated by the parties and those that were not. The *National Gypsum* court felt that to eliminate the possibility of a broad-brush application of *Chateaugay*, in which discharge of claims would occur whether or not they were con-

**42.** *In re National Gypsum Company*, (N.D.Tex.) was published on February 12, 1992, after both parties in this case submitted their briefs on the present summary judgment motion.

**43.** In a careful reading of the *Chateaugay* case, there are indicia that the court felt that discharge of costs relating to pre-petition conduct resulting in a release or threat of release should be limited to cases in which the costs were " 'fairly' contemplated" by the parties. First off, there are the references to the use of the term "fairly" discussed in footnote 3 *infra*.

Secondly, there is discussion that the Code's inclusion of "contingent" and "unmatured" claims refers to obligations that will be due with the occurrence of a future event that is "within the actual or presumed contemplation of the parties at the time the original relationship be-

tween the parties was created." *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex. 1980), aff'd mem., 646 F.2d 193 (5th Cir.1981). Thus, the *Chateaugay* court's use of "contingent" and "unmatured" claims is similar to the use of those terms in a contract law sense, requiring previous contemplation by the parties.

Lastly, the court indicated that it considered that such contemplation may exist in the context of rights and responsibilities arising out of public regulation. "The relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.' " *Chateaugay* 944 F.2d 997 at 1005.

templated by the parties, it would define its own test. This test limits the discharge of claims relating to pre-petition conduct resulting in a release or threat of release of hazardous materials to cases in which the costs were fairly contemplated by the parties. The *National Gypsum* court decided that "[t]he only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between costs associated with pre-petition conduct resulting in a release or threat of release that could have been 'fairly' [44] contemplated by the parties; and those that could not have been 'fairly' contemplated by the parties." *National Gypsum* at 139 B.R. 397, 407. The court held that only those costs that had been "'fairly' contemplated" by the parties may be discharged. *National Gypsum* at 407. The court listed a number of factors which are relevant to the application of the "fair contemplation" standard, such as knowledge by the parties of a site in which a PRP may be liable, NPL listing, notification by the EPA of PRP liability, commencement of investigation and cleanup activities and incurrence of response costs. *National Gypsum* at 407. Thus, the *National Gypsum* court adopted much of the reasoning of the *Chateaugay* court, but it established a test which would define the types of claims that would fall within the range of "dischargeable" claims under CERCLA in a bankruptcy context.

Although the present case can be distinguished in some ways from *Chateaugay* and *National Gypsum,* I feel that the principles taught in those two cases are applicable here. In this case, there is a suit between private parties and a debtor, unlike the *Chateaugay* and *National Gypsum* cases which took place in the context of government regulation, where the suits were between the EPA and a debtor. Although both of the other cases were decided in the context of a government regulatory relationship, it is not clear that the principles developed by the *Chateaugay* court and the *National Gypsum* court should not be applied here. Certainly the relationship between Counterclaimants and AMI is more like a contractual relationship than that between a tort-feasor and victim, despite the fact that it is not between a regulated party and a government regulatory agency like the EPA. That is, AMI and DBS entered into a contractual arrangement for the sale of the Holmesville facility, although the contract did not include express contingencies relating to release of hazardous materials. When Data Card purchased DBS in 1986, it was aware that the release of hazardous materials had occurred, due to it's retention of Samsel for environmental investigation. These arrangements make these parties contractual parties, at least on some issues.

Another difference between the present case and *Chateaugay* and *National Gypsum* is that in the present case, the site of the release of hazardous material was not reported to the EPA until 1986, two years after the bankruptcy proceeding, when Data Card notified the Ohio EPA of the results of the due diligence testing it had conducted at the site. In *National Gypsum,* the seven listed sites were on the EPA's NPL before the bankruptcy proceeding and in *Chateaugay,* LTV had been identified as a PRP at the 14 sites in question before the bankruptcy proceeding. Thus, in *Chateaugay* and *National Gypsum,* there was knowledge by the parties during the bankruptcy proceeding that they might be dealing in a government regulation context with the EPA.

In the present case, Counterclaimants DBS and AFI and plaintiff AMI had no such knowledge as none had reported the Holmesville facility to the EPA before the bankruptcy. Data Card, however, certainly knew it would be dealing with the EPA

---

**44.** The *National Gypsum* court noted that the court in *Chateaugay* used the term "fairly" on numerous occasions, "specifically in affirmation of the lower court's recognition that 'before a contingent claim can be discharged, it must result from pre-petition conduct *fairly* giving rise to that contingent claim.'" *In re Chateaugay Corp.* 112 B.R. 513, 521 (S.D.N.Y.1990) (emphasis added). "This court, finding the use of the term 'fairly' both significant and apt, adopts the same language." *National Gypsum* n. 22 at 407.

as a regulated party before it entered into the contractual relationship to buy the DBS shares, although not in the context of bankruptcy. Finally, the factors set forth in the above test may be applied between AMI and DBS but not AMI and Datacard. Datacard, as DBS's successor had no relationship with AMI, that these factors could be applied to. Rather, the application of this test will be between AMI and DBS. Despite these differences, I conclude that the relationship between parties that have incurred response costs and debtors who have released hazardous materials prepetition is more similar to a contractual relationship than to a relationship between a tort-feasor and the tort victim, and thus the principles of both the *Chateaugay* and *National Gypsum* courts should apply here.

Further, the legal reasoning applied to the facts in *Jensen, Chateaugay,* and *National Gypsum* fit more appropriately to the facts at bar. Although Judge Murphy in *Union Scrap* and *Sylvestor Bros.* did not cite *In re Frenville,* Judge Murphy's conclusion on when a claim arises for bankruptcy purposes is the same conclusion reached by the *Frenville* court. That is, the *Frenville* court held that a claim for bankruptcy purposes arose when a cause of action arose under state law. 744 F.2d at 337. Likewise, the *Union Scrap* court held that a claim for bankruptcy purposes arose under CERCLA when a "legal obligation" arose under CERCLA, which is when response costs are incurred. 123 B.R. at 836. The *Frenville* holding, however, has been rejected by numerous subsequent cases that considered the issue, including several in this district. *See In re Jensen,* 127 B.R. 27 (9th Cir. BAP 1991); *In re Black,* 70 B.R. 645, 648 (Bkrtcy. D.Utah), *In re Service Decorating,* 105 B.R. 859, 864 (N.D.Ill.1989), and *In re Diamond Mortgage Corp.,* 105 B.R. 876, n. 4 (Bkrtcy.N.D.Ill.1989). Further, this court agrees with AMI that the authority of the Minnesota cases is somewhat undermined by the court's reference to the District Court's reasoning in *In re Jensen,* 114 B.R. 700 (Bkrtcy.E.D.Cal.1990), whose decision Judge Murphy called "[a] sensible approach to balancing environmental and bankruptcy goals." *Union Scrap,* 123 B.R. at 838. However, the Ninth Circuit Bankruptcy Appellate Panel reversed the District Court's ruling in *Jensen,* and rejected the argument that a CERCLA claim in bankruptcy arise when response costs are incurred. *In re Jensen,* 127 B.R. 27, 33 (9th Cir. BAP 1991).

I agree with AMI that the analysis of the Minnesota cases oversimplifies the bankruptcy test for determining the existence of a claim. The issue is broader than whether a claim could be brought outside of bankruptcy. This is because, the Bankruptcy Code specifically contemplates the resolution of claims that would be premature in a non-bankruptcy forum. See Section 502(c) and Section 502(e). As pointed out in *Chateaugay:*

> "the Bankruptcy Code manifests a strong and clearly expressed congressional intent that a debtor be discharged from all claims, both actual and contingent, which arise out of pre-petition conduct. Moreover, the courts have effectuated that congressional intent by, as noted above, construing the concept of 'claim' very broadly. Therefore, this court may not and should not subvert that policy by judicially created exceptions not clearly supported by the bankruptcy statute itself or by other congressional legislation.
>
> In that regard, it is significant that the Bankruptcy Code itself specifically defines classes of claims that cannot be discharged, see 11 U.S.C. § 523, and in a reorganization context specifically limits these exceptions to individual debtors. See 11 U.S.C. § 1141(d)(2)
>
> . . . . .
>
> In addition, courts have required a clear manifestation of congressional intent in order to find that a debt is not dischargeable because of other statutory provisions ..."

*In re Chateaugay,* 112 B.R. 513 at 524.

The *Chateaugay* court was apt in noting that such an interpretation of "claim" arising under CERCLA would anticipate other CERCLA claims in the context of differing

bankruptcy situations. That is, should the court render the opinion that a pre-petition release of hazardous materials was not a "claim" in a Chapter 11 reorganization as that case was [and this one is], then what recourse would a party have who will incur response costs against a dissolving corporation in a Chapter 7 liquidation case? Since the claim would not "arise" until response costs are incurred, if they are incurred post confirmation the debtor's estate would have already been liquidated. On the other hand, if a claim exists at the time of release of hazardous materials, it is more likely that the debtor's estate will be available to contribute to cleanup costs. Furthermore, if a pre-petition release of hazardous materials is *not* considered a claim until response costs are incurred post-confirmation, then some corporations would not be able to reorganize at all due to the specter of non-dischargeable (post-confirmation) debts which would arise under CERCLA.

Thus, I find the arguments of the *Chateaugay* and *National Gypsum* courts convincing, and maintain that in the long run, it may behoove us not to narrowly interpret the CERCLA statutory language as the Minnesota court did. This court rather recommends that the district court hold that a "contingent claim" arises when the release of hazardous substances occurs, and such a claim may be discharged in bankruptcy if both parties "fairly contemplated" that such a claim may arise.

In the present case, it is necessary to determine whether the parties "fairly contemplated" that future response costs might be incurred. In cases which involve a debtor and a private party, factors other than those noted by the *National Gypsum* court must be considered in applying the "fair contemplation" standard since those factors dealt more with the government regulation context. In any case, to apply the "fair contemplation" standard, this court needs to make factual findings. Thus, the determination of whether the parties "fairly contemplated" that response costs could be incurred is a genuine issue of material fact.

Some of the factors that may be considered in this future determination of this are: before purchasing the DBS stock and the Holmesville facility, Data Card was aware of AMI's releases of hazardous materials at the site; the environmental risks which Data Card was aware of may have played a role in the purchase price Data Card paid for DBS, and Data Card clearly contemplated suit with AMI, as evidenced by its letter of notice of incurrence of response costs to AMI dated January 23, 1987. One of the factors that may be considered in determination of this issue with respect to DBS and AFI is whether anyone at DBS or AFI considered the Holmesville facility to be an environmental risk prior to the bankruptcy proceeding and the effect of the August 20, 1984 settlement agreement.

Thus, I recommend that the district court hold that a "contingent claim" arises when the release or threat of release of hazardous substances occurs, and such a claim may be discharged in bankruptcy when both parties "fairly contemplated" that such a claim may arise. In the present case, the application of such a "fair contemplation" standard raises a genuine issue of material fact with respect to all three Counterclaimants. Therefore, AMI's partial motion for summary judgment should be denied.

## COUNTERCLAIMANTS BREACH OF WARRANTY AND MISREPRESENTATION CLAIMS ARE PRE–PETITION CLAIMS.

Counterclaimants contend that the motion for summary judgment should be denied with respect to Counterclaimants' breach of warranty and misrepresentation claims as they argue that these claims arose post-confirmation when fraud was discovered. Counterclaimants have no basis to assert that there are material facts at issue on these grounds. AMI's sale of the Holmesville facility took place shortly after CERCLA was enacted in 1980. Due to the infancy of CERCLA the potential liability arising out of such a sale may not have been formed in many sellers' minds. Counterclaimants have presented no facts to

support their contention of misrepresentation. As to the breach of warranty, this clearly is a pre-petition claim upon which no test such as the fair contemplation test set forth in *National Gypsum* has been developed. These claims relate to a pre-petition contract, and as such, are contingencies which arose at the time of the creation of the contract. Since these claims are pre-petition claims, they are barred by AMI's discharge. I therefore recommend that the motion or partial summary judgment be granted as to counterclaimants breach of warranty and misrepresentation claims.

## COUNTERCLAIMANTS' COMMON–LAW CLAIMS AROSE PRE–PETITION

Counterclaimants contend that the motion for summary judgment should be denied with respect to Counterclaimants' other common law claims (nuisance, negligence, trespass, strict liability) because such claims arose post-confirmation. Counterclaimants rely again on *In re Forty–Eight Insulations, Inc.*, 58 B.R. 476 (Bankr.N.D.Ill.1986) and *In re UNR Industries, Inc.*, 29 B.R. 741 (N.D.Ill.1983), stating that these cases have held that pre-petition wrongful conduct that may result in a latent injury does not create a claim under the Bankruptcy Code. As discussed above, while the lower court decision in *UNR* might have so held, the *Forty–Eight* court and the Seventh Circuit in *In re UNR Industries, Inc.* did not so hold. *In re UNR Industries*, 29 B.R. 741 (N.D.Ill. 1983), aff'd, 725 F.2d 1111 (7th Cir.1984); *In re Forty–Eight Insulations, Inc.*, 58 B.R. 476 (N.D.Ill.1986). Once again, these common law claims, relate to a pre-petition contract, and as such, are contingencies which arose at the time of the creation of the contract. The application of the fairly contemplated test is inapplicable here also. Since these claims are pre-petition, they are barred by AMI's discharge. I therefore recommend that the motion for partial summary judgment be granted as to Counterclaimants' common law claims.

## COUNTERCLAIMANTS' CITIZEN SUIT PRECLUDES SUMMARY JUDGMENT

Finally, Counterclaimants contend that this motion for summary judgment should be denied with respect to Counterclaimants' citizen suit claims because this claim arose after the confirmation date. Provisions for such suits. The citizen suits arise under CERCLA and are found at CERCLA § 310(a), 42 U.S.C. § 9659(a) (1988). This section provides as follows:

**(a) Authority to bring civil actions**

Except as provided in subsection (d) and (e) of this section and in section 9613(h) of this title (relating to timing of judicial review), any person may commence a civil action on his own behalf—

(1) against any person (including the United States and any other government instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of any standard, regulation, condition, requirement, or order which has become effective pursuant to this chapter (including any provision or an agreement under section 9620 of this title, relating to Federal facilities); or

(2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency and the Administration of the ATSDR) where there is alleged a failure of the President or of such other officer to perform any act or duty under this chapter, including a act or duty under section 9620 of this title (relating to Federal facilities), which is not discretionary with the President or such other officer.

Despite the fact, that I agree with AMI's point, that Counterclaimants' characterization in this matter as a private attorney general is somewhat misplaced, if the results of the fair contemplation test set forth in *National Gypsum*, reveals that liability belongs to AMI, then possibly a citizen suit could survive. If the application of the test concludes that AMI's liability was released, then this citizen suit will be barred. Therefore, I recommend the

court rule that partial summary judgment is precluded at this time.

## CONCLUSION

For the foregoing reasons it is recommended that Plaintiff's Partial Motion for Summary Judgment be DENIED as to the claims arising under CERCLA and GRANTED as to the Breach of Warranty, misrepresentation and common-law claims.

Respectfully submitted,

DATE:   JUNE 25, 1992

_____

RONALD A. GUZMAN
United States Magistrate Judge